ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF HAWAII**

cc: JMS/FILER

**FILED IN THE**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF HAWAII**

NOV 21 2023

at 10 o'clock and 45 min. A M
Lucy H. Carrillo, Clerk LS

Randall Kelly Meyer (Pro Se) and
Sams Antics Incorporated

    *Plaintiffs,*

v.

President JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States of America

STATE OF NEBRASKA,

MIKE HILGERS, in his official capacity
as Attorney General of the State of Nebraska;

STATE OF MISSOURI,

ANDREW BAILEY, in his official capacity
as Attorney General of the State of Missouri;

STATE OF ARKANSAS,

JOHN TIMOTHY GRIFFIN, in his official capacity
as Attorney General of the State of Arkansas;

STATE OF IOWA,

BRENNA BIRD, in her official capacity
as Attorney General of the State of Iowa;

STATE OF KANSAS,

KRIS WILLIAM KOBACH, in his official capacity
as Attorney General of the State of Kansas;

STATE OF SOUTH CAROLINA, and

ALAN MCCRORY WILSON, in his official capacity
as Attorney General of the State of South Carolina;

    *Defendants.*

No. _____

C V23. 00470 JMS WRP

Received By Mail
Date NOV 21 2023

– 1 –

FSC, R16, IFP, cov.
Mailed On
Date NOV 21 2023

Claims

1. The "Economy" is "not well" ( 4:22-cv-01040 , 09/29/22 ) . This logical fallacy, presciently rebutted, by Plaintiff, Randall Kelly Meyer, in 2014, via song "Argumentum ad Oikonomos (Argumentum ad Frugalis)" (Originally broadcast on public radio, and now available on youtube, on the "channel" of dranonymous2000; search for the link in the "videos" section, or "videos" tab.) is the first phrase offered by these present Defendants, in their previous mockery-of-a-legal-filing (case cited above). Plaintiff, herein, claims that Defendants offered up disingenuous, mock arguments, both transparent and facile (4:22-cv-01040 ; District Court, Eastern Missouri, 09/29/22), in order to win by judicial action (Biden v. Nebraska, 2023) what was lost in a democratic election (see "history" for an account of the 2020 U.S.A. Presidential Election) , and, worse still, they used a common and childish ruse, a logical fallacy, to do so. Plaintiff has not published explication of said fallacy in a reputable logician's, academic journal, but will do so at the nearest convenient opportunity, just as soon as he gets done suing these traitors (see 18 U.S.C. § 2381); until such time as Plaintiff finds occasion to publish a definition of the "Because the Economy" fallacy, in a reputable journal, one must listen to the song lyrics for an efficacious explication of their logical error(s).

2. Plaintiff claims that none of the following claims are in question, or are questionable, and that the historical, philosophical, logical, scientific, legal and political work that they proffer, is empirically, evidentiarily, unimpeachable, and logically sound. The strong ethical and patriotic, jurisprudential pronouncements not only have "the ring of truth", but could in no way be denied by reasonable, thoughtful, intelligent, literate, adult human beings, living in the United States of America, in this 21st century. As such, Plaintiff requests summary judgment against Defendants, in the matter of their violation of Plaintiff's civil rights, in their attempting to re-enslave one who is declared free; declared free, multiple times, from every angle of every clause of the U.S. Constitution that might be utilized. Plaintiff is a free man, and Defendants' attempts to make it otherwise, are both undeniable facts, and undeniably traitorous. As such, Plaintiff makes motion that summary judgment, following Rule 56 of the FRCP, be issued in his favor, especially, though not limited to, the claims referencing (A.) violation of "Contracts Clause", U.S. Const. art. I § 10, cl. 1 and illegal interference with executive authority to implement the provisions of the Heroes Act of 2003, (B.) Conspiracy to violate civil rights, and, especially, illegal enforcement of debt peonage, and illegal enslavement and re-enslavement, via statutes and case law, such as, 42 USC ch. 21 § 1994, Wood v. Ward, 30FED.CAS—31 (1888), and 18 U.S. Code § 241, 242, 245 and various other civil rights laws etc., (C.) Defendants are criminal traitors, via (18 U.S.C. § 2381) and Plaintiff requests that a writ of mandamus be issued to the DOJ to force investigation of them, along the lines of the claims, as they have been detailed below, (D) the other miscellaneous constitutional laws and statute laws, as detailed and cited, in the claims, below.

3. Plaintiff claims that one duty owed to him, by one duly elected public servant, President Joseph R. Biden, a duty falling squarely within his executive capacity, as ordered and arranged by the various laws of Congress, whose purview was deemed appropriate by Luther v. Borden, in 1849 (the Dorr Rebellion case), is the provisioning of a Republican form of government, and especially in keeping with the originalist interpretation of the U.S. Const. art. IV § 4, a duty owed to states, and thus, by extension, to the citizens of those states, and Plaintiff, and further,

in the same Article and Section, shall guarantee against domestic violence. The traitorous actions of the Attorneys General, named as Defendants, as outlined below in the indisputable claims for which Plaintiff is requesting summary judgment, are a violence against Plaintiff, and have already resulted, and in the future will result, in unlawful taking of Plaintiff's property ( in violation of U.S. Const. amend. V. ), and diminished quality of life, and even, quite probably, diminished longevity of life. These actions, already undertaken, and planned in the future, are an affront against the Plaintiff, and a writ of mandamus, though an extraordinary measure, is essential to ensure that Plaintiff is not continuously violated, again. Plaintiff requests that a judge issue one writ of mandamus to President Joseph R. Biden to force compliance with the U.S. Constitution, and secure the Plaintiff's academic freedom, and economic freedom, against the usurpations of the pretended AGs, and their pretended authority, under their pretending "leader", DFPTDJT. Plaintiff has requested through regular measures, for some 20 years, that his rights not be violated, but zero efficacy is garnered from lower offices and courts, leading to this extraordinary measure's necessity, as a peculiar matter of public urgency. Plaintiff's request meets all three prongs as listed in Marbury v. Madison (1803), by Justice Marshall, namely, Plaintiff is owed the duty, the law affords him access to remedy (28 U.S.C. § 1361), and this remedy, though extreme ("peculiar emergency or public importance'), is to be found in a writ of mandamus, issuing from this court, to Plaintiff's duly elected President (and specifically not to DFPTDJT, the pretended "President"). Arguments that a president may not be issued a mandamus have been considered in NTEU v Nixon, 492 F.2d 587 (D.C. Cir. 1974), and it was decided that mandamus can be issued to compel the dutiful, ministerial actions of Presidents. If the judge should find that a lesser officer, (i.e. the DOJ, or the Secretary of Education) might, more rightly, be issued mandamus, to rectify the wrongs declared in this document, then, in keeping with the 1974 Nixon decision, that too, is requested by Plaintiff. Plaintiff will not be silenced, by judicial, legislative, executive, or academic, "Der Prozeß" (Kafka, 1914). Plaintiff is owed justice, and will receive it in this present action, before this present court. Marshall's discussion of the second "prong" of the test is quoted, here, for your convenience : " The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives injury. One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never failed to comply with the judgment of the court.". Plaintiff directs the court to see https://www.justice.gov/jm/civil-resource-manual-215-mandamus , for adequate description of "ministerial actions", namely, "the duty in a particular situation is so plainly prescribed as to be free from doubt and equivalent to a positive command.". Hereafter, within this suit, "Defendants" should be taken to refer to the non-Biden, "AGs" Defendants, as the only claim Plaintiff makes against Biden, rather, against the U.S. Federal Government, is this one, claim # 3. Plaintiff's complaints are largely arrayed against these AGs, and the "states" they purport to represent, and their recent judicial usurpations, as listed in claim # 1.

4. Notwithstanding Chisholm v. Georgia, 2 U.S. 419 (1793), and the resulting U.S. Const. amend. XI., conflict and outright contradiction of these with other Constitutional provisions necessitates federal consideration of this Constitutional question. Namely, the "Contracts Clause", U.S. Const. art. I § 10, cl. 1., disallows state legislative intervention in contracts between two private parties, and Federal jurisprudence (in the interest of justice, and in maintenance of a Constitutional, Democratic Republic, and in guaranteeing to the States, a functional federation of states, as Constitutionally required, U.S. Const. art. IV § 4, cl. 1.) requires intervention to stop said "State" interference between Plaintiff and the various, unnamed, "student loan servicers". Additionally, these "States" interference with the lawful exercise of President Biden's Constitutionally given powers (under the HEROES Act of 2003, as previously

implemented and called upon, for similar if not identical purposes by Disgraced Former President and Traitor Donald J. Trump (DFPTDJT, for short) the notorious Jan 6th insurrection leader and co-conspirator), and Constitutional mandate, specifically, as regards his responsibilities as Commander in Chief, and for ensuring citizen readiness, mental and physical readiness, to meet enemies, and challenges, both foreign and domestic, argue against employment of Chisholm and the 11th Amendment in considering the initial disposition for purposes of jurisdiction, in this case. Furthermore, Plaintiff, a "political dissident" (alleged, albeit, through unspoken allegations, but nevertheless rebutted, as Plaintiff denies, *a priori*, all charges of political unorthodoxy, and admits only to the espousal of philosophically and empirically "radical"—so-called—facts and opinions), ostracized, censored, American intellectual, who has already fled the country, twice, sought political asylum (in Canada, twice), and sued the U.S. government, unsuccessfully, three times, has legitimate claim, again, now, to numerous violations of his free speech, freedom of the press, freedom of conscience (rationality or logic; "Atheistic spirituality"), and various other rights protected by U.S. Const. amend. XIV.; all of these, arguably, are actions that, coupled with the landmark case Gitlow v. New York, 268 U.S. 652 (1925), combine to place this case within the purview of federal consideration, federal jurisdiction, in District Court. Plaintiff resides in an "undisclosed location", on Hawai'i Island ("The Big Island"). Furthermore, these six "States" have knowingly perpetrated this legal farce in a disingenuous fashion, utilizing disingenuous legal arguments to execute an "end run" around Congressional and Presidential authority, and Congressional and Presidential duty, and around the clear language and protections of the U.S. Constitution, "Contracts Clause", U.S. Const. art. I § 10, cl. 1., against "State" legislative intervention in private contracts. The Supreme Court has previously allowed suits, from individual U.S. citizens, against individual "States" when (a) "States" have consented to suit by dint of "the original frame of the Constitution", (b) "States" have engaged in suits in Federal courts, and responses to said suits, and determinations in said suits can be construed to be consent, as they are initiated by a State, eager for said suits, and (c) in such cases as Torres v. Texas Department of Public Safety, 597 U.S. (2022), Central Virginia Community College v. Katz, 546 U.S. 356 (2006), and PennEast Pipeline Co. v. New Jersey, 594 U.S. (2021). Federal Jurisdiction is claimed on the basis of a Federal Question.

5.  Defendants did willingly and maliciously seek to enslave, and / or re-enslave, the Plaintiff, and millions of other U.S. Citizens (i.e. student loan borrowers) for narrow political and economic purposes--provincial, asinine, illogical and traitorous purposes--and did utilize the court system of the United States of America as its instrumentation of the aforementioned return to bondage, debt-peonage, and effective—de facto--slavery of the aforementioned persons, and of the Plaintiff (See 42 USC ch. 21 § 1994). The Plaintiff, Mr. Randall Kelly Meyer, is the great great great great great great great grandson of Heinrich Wilhelm Raussman (Rassman), a Hessian "mercenary", AKA slave, sold to, or rented by, King George III, the brother in-law of Landgrave Frederick II of Hesse Kassel, and as such, Plaintiff possesses 1/512 "slave DNA", but Rassman was freed and pardoned, and his ancestral issue became naturalized free citizens, when Georg Heinrich Rassman officially deserted the Hessian/British army in May of 1783. Attempts to re-enslave his ancestors, some 240 years later, are frowned upon by Plaintiff's family, many of them veterans of foreign wars, fighting for the freedoms so starkly printed on these present pages, and so taken for granted by the disingenuous claims and pleadings of the Defendants, the "States"; "We" both the Meyers and the Rossmans, after Vietnam and WWII, respectively, are "not amused". Needless to say, if these are true and accurate histories and accusations, as plaintiff alleges, these actions would violate a number of Constitutional acts and provisions, statute law, case law, state laws, and simple social conventions and human decency.

History and posterity recoil at the mere notion of actions such as these. Applicable Constitutional and statute law includes. U.S. Const. Amend XIV. § 1, 3-4. ; 42 U.S. Code § 1983, 18 U.S. Code § 241, 242, 245, while more immediate, pertinent, precise, actionable, accurate and exact case law, and precedent, might be relied upon, such as, Wood v. Ward, 30FED.CAS—31 (1888) and Allgeyer v. Louisiana, 165 U.S. 578 (1897), (i.e., broadly construed, a landmark case concerning the freedom to make unhindered contract).

6. Plaintiff claims--and is frequently told--that he cannot work without a graduate degree, rather, his bachelor's degree is insufficient to garner acceptable employ (a state of affairs that, at age 14, he was advised of; his intentions, always being, to obtain a graduate degree and to do first-rate academic research). Since age 14, Plaintiff (now 43 years of age) has sought progressive responsibilities leading to entry and completion of a graduate program, with a PhD being the ultimate goal, and with his target vocation being academic professor and scientific researcher and author. Defendants, "States", by illegally and disingenuously utilizing the court system to make new law, and to interfere with private contracts, and to interfere with federal government amelioration, mediation, or abrogation of private contracts, under the HEROES Act of 2003, and by their furtherance of upholding illegal and voided debt—or, for the sake of the argument, seeking to uphold a formerly-legal-but-now-voided, formerly legitimate debt—"States", thusly, did seek to enslave the Plaintiff and force him into employment in unsuitable, insufferable, intolerable, unwilling work (Plaintiff has, already, been variously "employed"--utilized--as sales clerk, banker, lawyer, reporter, etc.; anything but "scientist"), and to those ends, further, additionally, Defendants sought to use government force, force of law (color of law), to "employ" Plaintiff at less than a living wage. This very same instrumentation was affected against Plaintiff's father, in another context, in the "Vietnam Era", when, by the opinion of one internationally respected economist, the Federal government utilized "The draft ... principally as a device by which we use compulsion to get young men to serve at less than market rate of pay." (John Kenneth Galbraith, Wall Street Journal Obituary/Retrospective Editorial Comment, "The New Industrial Economist", by David R. Henderson, May 2, 2006, Wall Street Journal,). Plaintiff's father, Regan Meyer, a veteran of the "Vietnam Conflict" taught his son about the bonds (securities) of Alexander Hamilton, and the ruined value of the dollars of the Continental soldiers, and of the Embalmed Beef Scandal, that T.R. Roosevelt, personally witnessed, and of the treachery exacted against the Bonus Army, by the very "heroes" of the next war (i.e. Eisenhower, Patton, McArthur, and etc.). Plaintiff has no illusions about the propaganda value of "patriotism", to the powerful and corrupt. Plaintiff demands that Defendants answer, under oath, for their false patriotism; demands they answer, under oath, Plaintiff's accusations and claims, as listed above, and below, and additionally, Plaintiff claims that the Defendants did seek to weaken the nation, not with poisoned beef, or weakened dollars for the working and fighting classes, but with weakened minds and with reduction of their (the peoples') judicial and political rights. Plaintiff claims that these are the meanings and intentions of the "States" unforgiven forgiveness, as outlined in their suits, (4:22-cv-01040 ; District Court, Eastern Missouri, 09/29/22), and (Biden v. Nebraska, 2023). Plaintiff claims that this is a traitorous application of law, a deliberate weakening of the nation (18 U.S.C. § 2381), in advancement of "the enemies' ", the "terrorists' ", goals and it is disingenuous argumentation advanced by Defendants, and President Biden has every right, and indeed a duty, to prepare the nation for armed conflict, mentally, intellectually, philosophically, and academically, and to that end, and with precedent well set, and settled, for the corporeal health of soldiers, (See, Richard B. Russell National School Lunch Act (79 P.L. 396, 60 Stat. 230),   , and  the "Mission Readiness" report, entitled, "Breaking Point : Child malnutrition imperils America's national security" ; September, 2020 Council For A Strong America.). President Biden has rights, and a duty, to

procure mental fitness and health of, and for, the citizenry, for the future readiness of the future soldiers of America (79 P.L. 396, 60 Stat. 230; 1946: 21 U.S.C. ch. 12 § 601 et seq. : Pub. L. 59–382 : 34 Stat. 669 : Public Law 88-525-AUG. 31, 1964 : 7 U.S.C. 2011 et seq. : Pub. L. No. 86-341, 73 Stat. 606 (1959) ) , for future wars, conflicts, police actions, and operations. In essence, Plaintiff claims, in both "hypothetical-metaphorical" fashion, and in real examples, that a poisoned fiscal, political, epistemological, rhetorical climate, leading to poison beef or poison schools, or lack of beef or lack of schools, when both quality beef and quality schools are abundant, is a situation readily identifiable and readily remediable, and, further, it is claimed, that it is both the right and duty of the commander in chief to rectify the situation, quite irrespective of specific statute law enabling such. Wide latitude, with presidents, is almost always given, when preparing for new challenges, on new military fronts, i.e. the digital, information, psychological and cultural wars of the 21st century, necessitating education for maintenance of a healthy and vibrant, Democratic-Republic. Furthermore, Defendants did unwittingly—or perhaps, wittingly--contribute to conspiracy to violate Plaintiff's civil rights, namely freedom of speech, and did so through disingenuous legal instrumentations, i.e. superfluous and frivolous lawsuits, and did seek to produce a chilling effect, and deny Plaintiff's rights to speak freely, in an academic setting, a privilege already denied Plaintiff, and ignored in the three previous lawsuits, alluded to above (See (I.) Canada (2020-2022) : RAD File VC1-07215 , RPD File VC0-03082, Canadian Federal Court IMM-4274-22; and See (II.) USA (2022), U.S. District Court, Washington Western, Case no.  2:22-cv-00232-RSM; and See (III.) USA (2019-2020, 3 cases) United States District of Vermont, Case No. 5:19-cv-175, U.S. District Court, Vermont, Case no. ????, U.S. District Court, Vermont, Case no. ??? ; and, finally, See (IV.) USDOJ complaint and response (2020) # 171374-MGG and  EEOC complaint # ??? circa 2005-2010?). Plaintiff's claims and complaints are ongoing, and connected, and Plaintiff will not accept anything less than a proper trial for his tormentors and political, fiscal, academic and philosophical "enemies" (or adversaries), in keeping with proper jurisprudential procedures in the West, stretching back to British Common Law and even Roman Law (U.S. Const. Amend VI., confrontation and notice clauses; i.e. if Plaintiff is to be "tried" by reputational slander, and / or, "blackballing", let it, instead, be in a courtroom, with official charges brought by official denouncers, not in some societal "whisper" campaign, reminiscent of something in a Kafka book--or a Kafkanian nightmare—or from some third world or Eastern-European, byzantine notion of bureaucratic, sham-jurisprudence.) . While Plaintiff does not like to have "enemies", or admit to having enemies, after 20 years of opposition to a perfectly plausible hypothesis, namely, "Meyer's Linguistic Law" (to say nothing of "Meyer's Optical Approximation", "Meyer's Robotic Eye", and "Meyer's Massively Parallel Anthropoid Olfactory and Gustatory Transducer"), Plaintiff has resigned himself to a possession of "enemies", and to referring to them as such. Plaintiff asserts that VN^2 has always, and will always be equal to S, (Meyer's Linguistic Law, defined, is simply V*(N^2) = (V * N * N) = S , and that such a Law was, and is, derived from simple permutation and combination formulae and from basic Linguistic Typology studies (see David Crystal's ed. "Cambridge Encyclopedia of Language", 1st edition, 1987). Meyer's Law holds, irrespective of the Natural or Artificial Intelligence that the equation is being applied to, and Plaintiff further claims that opposition to this has always been wrong, and will always be wrong, both in the efforts to diminish the importance of this equation, or in trying to dispute the factual nature or physical accuracy of said equation. Defendants opposing said hypothesis are often partially or completely scientifically illiterate (not to mention philosophically illiterate and epistemologically challenged) and further, more often than not, utilize rhetorical flourish or dastardly legal or political tricks to "win" the argument. Plaintiff claims that they are cowards, and that the Defendants' parents did a horrible job raising them, and that their universities did a horrible job

describing ethics, epistemology, and logic to them. Plaintiff would very much like to see, in print or in person, Defendants' responses to this particular claim. Plaintiff claims that academic ostracism, and "fiscal musculature" is no joke. Plaintiff—and Walter Sobchack (The Big Lebowski, Working Title Films, 1998)—reminds the Defendants that "... the Supreme Court has roundly rejected prior restraint", but, also, in a recent case (whose ultimate ruling Plaintiff happens to disagree with) the Supreme Court majority opinion is quoted "[Many universities] ... have concluded, wrongly, that the touchstone of an individual's identity is not challenges bested, skills built, or lessons learned ..." (Students For Fair Admissions v. Harvard, 600 U.S. 181 (June 29th, 2023)), adding additional political context for this present case, and for the "American Meritocracy", in general. Plaintiff claims that "idiocy", more often than not, hides behind such nefarious, censorious machinations, as Defendants have undertaken. Plaintiff claims that the Defendants are idiots, and perhaps irreparably so, and certainly, that their idiocy violates laws that have harmed the Plaintiff, and Plaintiff would very much like to hear the Defendants, under oath, deny either that (a) they are idiots, (b) their idiocy caused harm, or (c) their idiocy was entirely avoidable and that it was illegal for them to not take reasonable steps to avoid being stupid. If, in fact, the Defendants are not idiots, and can find efficacious ways to prove that this is so, then the Plaintiff will proceed, nonetheless, with prosecution of their intelligent, deliberate, illegal harms to the Plaintiff. Plaintiff claims that he has not wielded the pejorative "idiot" for verbally abusive purposes, but instead, for empirical purposes, and to give proper context, as John Milton's Aeropagitica (1643) will be quoted, later at length, but, here, shortly, on the subject of "'idiots" and other lawbreaking censors. Milton bemoans the prospect, in his essay to Parliament, that an author, weary with the labor of bringing a book to fruition, must then contend with the notion that his book " ... must appear in Print like a punie with his guardian, and his censors hand on the back of his title to be his bayl and surety, that he is no idiot, or seducer, it cannot be a dishounour and derogation to the author, to the book, to the priviledge and dignity of Learning.". Book writers, as a statistical tendency, tend not to be idiots, while politicians and attorneys are subject to a whole different set of probabilistic calculations.

7. Plaintiff has a legitimate and unique theoretical program, some valid hypotheses, many untested-yet-testable hypotheses, and all of it, shamefully, unpublished and illegitimately censored, in these "United States". Defendants play a small, but at this juncture, crucial part in this conspiracy to deny Civil Rights to a U.S. Citizen ( See 42 U.S. Code § 1983 : 14 Stat. 27–30 : 18 Stat. 335-337 : 16 Stat. 140-146  : 16 Stat. 433–440 : ch. 22, 17 Stat. 13 : and P.L. 42–22 ) . Plaintiff has applied to two graduate programs and intends to attend, in the Spring of 2024, if these "States" have not already ruined that chance, with their silly semantic-pedantic-jurisprude, troglodytic-philistine games; their reputational credit-slander. Plaintiff intends to run for Congress, in Hawaii, in Spring 2024, as an Independent candidate, as he has done before in Vermont, in 2014, in effort to get to the bottom of this corruption, and obstruction, and to, possibly, fix it at its source.

8. Plaintiff was deported from Canada and accepted into America, in October 2022, after being denied political asylum (October 2020 to October 2022) and denied his last appeal for continuation of residency--on humanitarian grounds--in Canada. America, presumably, accepts Plaintiff as a citizen, and must afford the citizen all the rights that other citizens possess, including its corporate citizens. Plaintiff incorporated in 2004, as Sam's Antics Inc., an Artificial Intelligence "A.I." company, in the State of Rhode Island, after just 2 years of illegal employment discrimination, as Plaintiff could not tolerate being unemployed and intelligent and censored (and young and vibrant and strong and wise and competent and ethical, and active), in

these "United States". The corporation was founded to help assert his political rights and economic rights, and his rights to earn a living by his scientific and philosophical writings and experiments. Plaintiff claims that even this corporate "personhood" has experienced violations of its rights, by government, at all levels, by academia, and by the economy at large. This libel and slander (with libel and slander being a very different kind of suit, that Plaintiff, for brevity's sake, will not attempt to make, herein) led directly to 20 years lost salary, at approximately 20,000$ /yr. (entry level; commensurate with skill and experience), or, 400,000$. In actuality, the lost salary—the worth or the value--of a stymied and stifled youth is egregiously incalculable. This present lawsuit is just the latest degradation that the Plaintiff, a free thinker, has endured in these "United States", in the span of the previous 20 years. Plaintiff claims that every second spent on his own legal defense—as a Pro Se litigant—is a second wasted, and a second that would be better spent on his real research, and that all, or many, or most of the named Defendants, co-conspirators, and "enemies", listed specifically, or mentioned obliquely, above, are more than happy to waste the Plaintiff's time in this fashion, and they do so, illegally, unethically, and traitorously, with real intention, of real harm, to both Plaintiff, and other persons like the Plaintiff, and by extension, to the country, and posterity. Plaintiff would very much like to see the printed response of Defendants, to this claim, and is even more eager to hear their opinions on the witness stand. Plaintiff takes this opportunity, on this occasion, to warn all parties about a previous time when The United States was caught unprepared, scientifically, for changing international events, namely, the post-WWI report by Frederick Eugene Wright regarding the situation, for war materiel, in the field of scientific glass and optics (F.E.Wright, "The Manufacture of Optical Glass and of Optical Systems: A War-Time Problem", Paper on Optical Glass No. 40, Ordnance Dept. Document No. 2037, Washington, D.C. 1921). Plaintiff Mr. Meyer has a hypothesis (a long held hypothesis, which, according to A.I. expert Melanie Mitchell's academically published timeline, Meyer's Law has survived and outlived, in obscurity, at least one of the 2 or 3 or 4 "A.I. Winters"), untested, unrecognized, and extant, in a field crucial to America's future (See National Security Commission Artificial Intelligence report (NSCAI), March 1, 2021), and he is willing and able to investigate this unknown area, if civil and governmental society will step out of the way (or help!), and allow a level playing field, an action they have, stubbornly, so far, refused to undertake. The un-seriousness with which others undertake the task of A.I. is underscored by the entire 700+ page report of the NSCAI lacking the phrase "olfactory", "gustatory" or "transducer" (amongst other key, essential phrases they've omitted), anywhere within the report, ostensibly limiting any future official U.S. investigation of A.I. to two, or at best, three sensory modalities. Plaintiff will go on record, here, stating that no General-purpose A.I., or "Strong-AI" can take place without advanced olfactory and gustatory transducers. The direct analogy, to the history of a century ago, is striking; both Britain and the U.S had trouble obtaining good optical glass when the supplies from the Schott, Abbe and Zeiss factories were shut down, at the outbreak of WWI. If China should figure out that the American plan for A.I. is fundamentally flawed, hobbled by a three-sense artificial representation of a five-sense "animal", i.e. the "naked ape", Homo sapiens, they will find themselves to be at a distinct advantage. The American program for A.I. is hobbled by this exact limited worldview and additionally suffers from, (a) a re-emerging imperialism in the 21st century, (b) a sad devotion to a poorly defined notion of full-spectrum dominance, (c) a limited context of the philosophical importance of full-spectrum dominance in modern world affairs, (d) lingering unphilosophic notions and views of the "soul" and the attending unquestioned axiomatic bases of these views, rather unfortunately rampant in this modern civilization, and somewhat uncharacteristic of this marginally Protestant nation, that formerly tended to embrace such honest philosophic debate, and (e) ultimately, as intimated in one of the claims below, an overall un-philosophic "zeitgeist" in 20th and 21st century American

thought, leading to the functional philosophy of the culture being unstated, feral, reactionary, and quite divorced from the two main branches of European ("Western") philosophy (i.e., namely, Analytical and Continental), and quite divorced from anything developed in the Western hemisphere, the "New World", (namely, either transcendentalism or pragmatism). The abandonment by the Americans, as a people, as a whole, of the Enlightenment, broadly, and of its attending scientific philosophy in the 21st century, and abandonment of the dominant Anglo-American tradition of Analytical philosophy, not to mention the somewhat-associated native pragmatism, as expounded by founding philosophers of the school, Peirce, Dewey, James, and Holmes (See "The Metaphysical Club", Menand, 2001; the 2002 winner of the Pulitzer Prize for history), is largely responsible for the limited sensorial view of the human animal, and of its emulations and simulations as evidenced by these early 21st century American, mistaken conceptions of A.I. At the time of the writing of this lawsuit (November 4, 2023; slated for filing sometime next week), President Biden has just issued an executive order (10/30/2023) mandating A.I. safety disclosures from "Big Tech" companies, and on November 1st and 2nd, 28 countries met and signed the Bletchley Declaration supporting and outlining the peaceful and ethical development of A.I. in the 21st century (with a G7 pronouncement, following on, shortly thereafter). Plaintiff is skeptical about the efficacy of these actions and documents, considering the lack of philosophical depth, on the issue, evinced by either of these pronouncements, or the lack of incisive analysis of the economic and fiscal environment they are meant to address. Several commentators have discussed the concept of "A.I. winter", and in particular the concomitant excessive expectations, and irrational market exuberance, and since Plaintiff has seen about 20 years of dilettantish pomp in the field, and Plaintiff is effectively locked out of the debate, in the press and in academia, Plaintiff therefore expects continuous boom and bust cycles, fiscally and reputationally, and continued A.I winters until such time as A.I. researchers again adopt a scientific attitude, via Humean and Lockean, Analytical philosophy, and ancient Greek, axiomatic, and symbolic logic. Plaintiff has good reason to believe the process of innovation has been circumvented and the meritocracy of the Enlightenment, broken. Plaintiff claims that a lack of two whole sensory modalities (olfactory and gustatory) in the A.I.s presently conceived, and conceivable, within the 21st century, Western science "zeitgeist", will produce, in the context provided by simple application of Meyer's (Linguistic, Combinatorial) Law, a "semantically constrained" intelligence, lacking in certain crucial knowledge about the world, and thus, in such a "vein", full-spectrum dominance by such A.I.s can never, truly, be achieved. Plaintiff further claims that full-spectrum dominance is not particularly ethical in the first place, and Plaintiff points to election interference, and even domestic "weaponization" of social media, and the signal dominance and competition typified by military "police actions" and "conflicts" of the early 21st century, as chief examples of unethical, harmful usage of electronic devices. Propaganda devices, as old as the printing press, and like the "Gospels" before it, have always played an important, and central, role in American life, and with each wave of technological innovation and improvement, the potential for damage becomes, it seems, exponentially greater. The law has always tentatively engaged with, and alternately restricted, these new technologies, and in the USA this has resulted in at least two major attempts to reign in the excesses of the age: first, in the early 19th century, as exemplified by the Alien and Sedition Acts, and later, in the early 20th century with the Defense Secrets Act of 1911, the Espionage Act of 1917 and the Sedition Act of 1918. Finally, in the 21st century, we have the unresolved issues of the Assange-Snowden affair. A modern perspective on the nature of human communication in the 21st century would highlight the fact that the lines between sensory information acquired by Natural Intelligence (i.e. human sensory apparatuses and minds), and that transmitted, and sometimes modified or enhanced, by electronic means, is being blurred, and freedom of speech issues, and the laws governing the occasions of its

restriction, are increasingly becoming more complex. Increasingly, "who owns the bits and bytes" and who owns access to them, will be litigated and legislated, in the 21st century. Plaintiff cannot change this fact, and can offer little advice on how it should proceed, except, via the old adage about porcupines who mate; "very carefully".Plaintiff claims that the "states" and the country, as a while, can get rid of him, if they wish, since Plaintiff will live anywhere where he is allowed to do his research, for payment, of real money. In short, if the USA wants to shed this A.I. researcher, let them do so, explicitly, as they had every chance to do in 2020-2022. Plaintiff is amenable to relocation to Australia, or New Zealand, or, less favorably, to China, where, presumably, A.I. researchers are not left to squat, and starve, in the rainforest, on the side of a volcano, on an island in the middle of the ocean. Presumably, the USBOL cites statistics of average salaries for a reason? Presumably, there is some legal enforcement regarding fair pay and deterring censorship and prior restraint of academicians? If there is, Plaintiff requests that the court direct him to the proper agency, with a letter of recommendation, so Plaintiff can begin to work, and live.

9. Defendants did, knowingly and willingly, and shamefully, in a series of cowardly and brazen acts, before their mothers and fathers and children, before their schools and churches and teachers and doctors and nurses and soldiers and neighbors, before the courts, the lawyers, the press, before all of posterity and before their own particular conception of the (wholly imaginary) Godhead, Defendants did thusly seek to illegally force their own ignorance and unethical worldview upon their victims, and, more to the point, upon the Plaintiff, Mr. Randall Kelly Meyer, son of a veteran of "The Vietnam Conflict" and retired IBEW union employee with "The Telephone Company" (monopoly dissolved, after United States v. AT&T , See, 552 F. Supp. 131 (D. D.C. 1982) ), Regan Shawn Meyer, and great grandson of WWII veteran, Ralph Kelly Rossman, himself, an employed engineer and inventor at Gettig Manufacturing / Gettig Mills / Gettig Wire (see USP # 2,810,280). Needless to say, a "military family" does not suffer such indignities, lightly, nor does the son of a proud union man tolerate, silently, 20 years of illegal libel, slander, slavery, and "unemployment" (so-called), a 20-year period that was a fate that was worse than that which befell "The Greatest Generation", in their infamous ten-year ordeal, i.e. "The Great Depression". As evidence of the "States" maliciousness and / or gross negligence, one need look no further than the historical record of one of these purported "States", specifically, the case of Arkansas and the missing Smithsonian money, circa 1841. It was left to other states, in these "United States", other more intelligent and more patriotic states, to make up the slack for such slovenly and idiotic country bumpkins (See "Aeropagticia" (1644) and several claims, both above and below, citing Milton, for a proper definition of "idiot", as an empirical term, that Plaintiff, a trained scientist, trained in the field of Intelligence, both Natural and Artificial (N.I. And A.I.), applies, routinely in this document, to the Defendants). If certain "So-Called States" wish to remain in the dark ages, that is their right, and they have any number of state laws that can be applied--inflicted--to such end purposes, upon their unfortunate denizens—and upon their indentured servants and slaves--but for President Biden, and the nation he was elected to represent, these actions, that can only serve to degrade the mental readiness of America for this coming 21st century global competition, amount to a traitorous comfort and aid to the enemy, and unseemly and unethical aid to our chief commercial competitors in the coming decades. If one "state" forces ignorance, idiocy, and docile servitude upon the other states, and more importantly upon the denizens and citizens of those states, and does so by seeking judicial activism to overthrow the will of the people and their elected leader, President Biden—specifically elected to do a specific job, a job that needs doing and must be effected and enacted for the good of the nation, as determined by the will of those who elected him to do those tasks,

and also, as determined by his duty to ensure military readiness, including mental readiness—this is very much at odds with the tight-knit confederation of states and strong central government envisioned by the Federalist crafters of the Constitution, and is not in keeping with any originalist interpretation of the framers' intent or specific meanings of specifically written English words that the framers specifically used. It is a "State" violation of the U.S. Citizens right to speak freely, more importantly, to speak intelligently, and it is a direct intrusion of a "State", or several specific "States", in this case, into matters of national readiness in times of war or emergency (See also, New York Times article of 03/04/2013, entitled "Banks Find More Wrongful Foreclosures Among Military Members", for a description of loan issuers attitudes towards patriotic service, in times of war, conflict, and emergency.)

10. People must be educated. Crushing debt, poverty, debt-peonage (42 USC § 1994) and slavery cannot produce an intelligent, healthy, engaged, active, civic and patriotic citizenry and, thus cannot foster a successful nation based on such qualities. President Biden has a duty to provide those conditions under which the American people can obtain an education, of reasonable value, at a reasonable cost; as a practical matter he owes this duty, as he is charged with military readiness of the nation, which cannot be procured without attention paid to both body and mind of the American people. Specifically, in this presently litigated case, censorship of Plaintiff, a scientist, working in the field of A.I., alone, is enough to produce a stunted intellect within the nation, and in the world at large, and gives aid and comfort to "the enemy", as is variously, at times, defined and redefined, from time to time, oscillating and vacillating between those various parties which war is declared against, and among whom "conflicts" and "police actions" are arrayed against. Furthermore, the U.S. government has, in the past, in issues relating to national readiness, supported nutrition of the body--e.g. through establishment of school lunch programs and provisioning of food stamps,--for the future workers and soldiers of our militant nation and so, one can easily see that the application of federal laws in furtherance of government access to, and procurement of, mental readiness, illustrates that this is a logical difference of degree and not one of kind. While mind and body might, technically, be said to be separate "kinds", philosophically and logically, as far as the Federal Government is concerned, when it comes to the issue of citizen health, soldier health, and worker health, they are effectively the same. The detriment of one, of necessity, in a direct causal relation, effects the other, and neither type of "health" can be obtained without adequate support of the other "kind". These "states"—so-called—have not only violated the rights of U.S. citizen to be as intelligent as they want to be and are capable of being, but they have also violated the federal government's rights to enjoy the benefits of said educated citizenry. While we most often consider the Federal Government as having duties, rather than rights, in this case, by extension, the Federal Government's duty to provide a strong central government (i.e. one capable of guaranteeing a republic to the states, and one capable of guaranteeing the rights of the people, as laid out in the Bill of Rights, and elsewhere) combined with the efficacious law which empowers them to effect said duties, gives that government rights to determine, as it has, with myriad statute laws, too innumerable to name here (with Justin Morrill's work being a particularly pertinent example, and worthy of mention, here; 7 U.S.C. § 301; and 7 U.S.C. § 321), the manner in which they can best effect the securing of freedoms and the provision of a democratic-republic to the states, and to the people. The Federal Government's duty to provide and protect rights combined with the powers they were given to affect that provision, and combined with their actual execution to that end, creates a right, perhaps in a broad and metaphorical way, but perhaps, also, in a legally binding way; a right of the federal government to enjoy the results, the success, of their labors. Chief among these benefits to the government is an active, engaged, intelligent citizenry, without which democracy cannot survive. So, in

-11-

summary, the "States" have not only violated the Plaintiff, and myriad other youthful Americans, but have done a disservice to the federal government by denying them the right to enjoy the success of its implemented programs; in essence, these "States" have acted at counter-purposes, in countervailing fashion, and, thusly, are snatching defeat from the jaws of victory. Adler v. Board of Education, 342 U.S. 485 (1952), overturned in Keyshian v. Board of Regents 385 U,S. 589 (1967), and, see also, Meyer v. Nebraska, 262 U.S. 390 (1923).

11. Plaintiff claims that the Defendants did file suit against Plaintiff's duly elected representative, President Joseph R. Biden, in an effort to "unforgive" the Plaintiff's "forgiveness", a cowardly and inhuman act, if ever there was one. Plaintiff claims that Defendant's motive was mere monetary gain (contrary to 42 USC § 1994) and had no basis in law, and had neither the goals or aims of procuring strict adherence to the law, nor those of delivering justice. Plaintiff requests that the Judge direct a complaint to the relevant "State" bar associations, for review of the offenders' law licenses.

12. Plaintiff, Mr. Meyer, has a Bachelor of Science degree in Marine Biology, from the University of Rhode Island, and considers himself, irrevocably, an evolution biologist. Further, he has sought, for 20 years, appointments of advancing responsibility and duties in that field, and has been denied such, partially on illegitimate fiscal grounds, but now further exacerbated, and given an air of legitimacy, by the Defendants most recent actions, as outlined in the claims, above. Mr. Meyer would like to go on record, here, that he will take no oath of anti-evolutionism, as Keyshian vs. The Board of Regents guarantees that no such test for academic or government appointments may be applied. See also Adler v. Board of Education, 342 U.S. 485 (1952), overturned by Keyshian v. The Board of Regents. See also Meyer v. Nebraska, 262 U.S. 390 (1923) as Plaintiff Mr. Randall Meyer does not intend to speak in the classroom any dialects other than Scientific English and Evolutionary English, and rejects all state, county or federal attempts to enforce such barren, unempirical, un-philosophical vocabularies, as may be currently popular in the wider American culture.

13. Plaintiff, Mr. Meyer, who's ancestor's "slavery", or "mercenary impressment", formerly in force under an agreement between King George the III and the Landgrave Frederick II of Hesse-Kassel, was nullified upon Washington's crossing of the Delaware River, and again on Washington's second crossing of the Delaware, prisoners in tow, following the subsequent Hessian surrender at the Battle of Trenton. This fact is crucial when considering Plaintiff's citation of Wood v. Ward, 30FED.CAS—31 (1888), and regarding the seeking of monetary reparations from entities that seek, 200+ years later, to re-enslave formerly enslaved persons (contrary to 42 USC § 1994); this argument and claim must be viewed, especially, in light of a Post-Civil War legal environment. Again, for a reminder as to precisely "how and why slavery is bad for Democracy and freedom", please reference the appropriate case law emerging from Immokalee, i.e. "The Immokalee Cases", namely, U.S. vs. Flores 1997; U.S. vs. Cuello 1999; U.S. vs. Tecum 2001; U.S. vs. Lee 2001; U.S. vs. Ramos 2004; U.S. vs. Ronald Evans 2007; U.S. vs. Navarrete 2008; U.S. vs. Bontemps 2010; U.S. vs. Global Horizons 2010.

14. Plaintiff, Mr. Meyer, did borrow some 12,000 dollars (approximately) during the course of study leading to attainment of his degree, which he received in 2002. These facts are beyond dispute. What is (occasionally) disputed (unconvincingly, unempirically, and / or half-heartedly) is the 20 subsequent years wherein his degree conferred no status to him beyond that of a person who did not study for and obtain said degree, and his investment, of time and money, and in intelligence and strength of character and diligence, affected as it was, by Plaintiff, with

intention to produce a strong, and flourishing freedom, within the nation, was instead, mocked and ridiculed at every turn. The penultimate insults, "Intolerable Acts", resulted in fines bringing his alleged balance up to -$20,000 (juxtaposed, approximately, with, "Bureau of Labor and Statistics https://www.bls.gov/oes/current/oes_nat.htm, Biological Scientists entry 19-1020 @ $96,460, and Life, Physical, and Social Sciences Occupations entry, 19-0000 @ $83,640" ), a ridiculous pittance when one considers the scam of 20 years of lost wages (approximately 2,000,000$ assuming Mr. Meyer possesses average, or below average competence, and thus, in a meritocracy, commensurate remuneration) Mr. Meyer has endured, at an absolute minimum of 20,000$/yr., approximately, lost salary (one also should not neglect the consideration of the federal government's lost revenue from the taxation of said salary). The height of insolence and "ersatz aristocracy" illegality—with blood aristocracy and titles being explicitly outlawed by the Constitution (U.S. Const. art. I § 9, cl. 8.)—was the recent revocation of the national student debt forgiveness, in a sham judicial process, plunging Mr. Meyer back into unlawful servitude; servitude to a class of people who will not accept his services as biologist, in exchange for monetary pay. Mr. Meyer will never consent to trade his professional services for below market wage (again, see claim 4, above, and John Kenneth Galbraith, Wall Street Journal Obituary/Retrospective Editorial Comment, "The New Industrial Economist", by David R. Henderson, May 2, 2006, Wall Street Journal), and most certainly will not trade professional expertise for less than minimum wage, the wage that would normally be required by law. Plaintiff, at this moment, claims and cites a piece of wisdom, deriving from his own field of expertise, rather, Plaintiff quotes, at length, from Stephen Jay Gould's book "The Structure of Evolutionary Theory", as an admonition on the subject of character assassination, professional feuds, ideological intransigence, and "group think" : Gould writes, "As a working proposal, and as so often in this book (and in human affairs in general), a "Goldilocks solution" embodies the blessedly practical kind of approach that permits contentious and self-serving human beings (God love us) to break intellectual bread together in pursuit of common goals rather than personal triumph. (For this reason, I have always preferred, as guides to human action, messy hypothetical imperatives like the Golden Rule, based on negotiation, compromise and general respect, to the Kantian categorical imperatives of absolute righteousness, in whose name we so often murder and maim until we decide that we had followed the wrong instantiation of the right generality.) We must, in short and in this case, steer between the "too little" of refusing to grant any kind of "essence," or hard anatomy of defining concepts, to a theory like Darwinism; and the "too much" of an identification so burdened with a long checklist of exigent criteria that we will either spend all our time debating the status of particular items (and never addressing the heart or central meaning of the theory), or we will waste our efforts, and poison our communities, with arguments about credentials and anathemata, applied to individual applicants for membership." pg 7 Gould, 2001, "The Structure of Evolutionary Theory".

15. Plaintiff, having run for Congress in the sole Representative seat in VT, as an Independent Candidate, back in 2014, is acutely aware that he (arguably) ran for Justin Morrill's seat, the Congressman who conceived and pushed through the Land Grant Acts, Post-Civil War legislation (12 Stat. 503 (1862), 7 U.S.C. § 301 and 26 Stat. 417, 7 U.S.C. § 321), and further having personally attended a land grant university, Plaintiff further claims that only a cowardly traitor to country, and Party—Lincoln's Party—could ever bring suit against thrifty and intelligent, patriotic, working-class students; the flowering youth of American Culture. Plaintiff further claims that under 7 U.S.C. § 325 that "States" misapplying funds earmarked for their Land Grant Universities must replace the funds from their own budget, and Plaintiff further requests that the judge issue an order of mandamus to force the DOJ to investigate the Land Grant Universities in Nebraska, Kansas, Missouri, South Carolina, Iowa and Arkansas, for

misappropriations to the tune of some $ 1.63 trillion U.S., namely and principally, at Kansas State University, University of Kansas, University of Nebraska @ Lincoln, University of Arkansas, Iowa State University, University of Missouri, South Carolina State University, and any other Land Grant Universities or Colleges that reside in a "State" that feels that their Attorney General has excessive power—the power to nullify contracts, in violation of Constitutional prohibition of such state interference—and , indeed, states whose AGs are so delusional that they think they have more power than the Duly Elected President and / or the will of the people of the United States of America and / or the military, and military families that have kept them safe, these past two centuries. It is suggested that the recuperation of funds from these rebel "States" be applied by the Biden administration to fund student loan forgiveness, effected by the HEROES Act of 2003, as previously applied by the Trump administration, once, already, or, if deemed more appropriate by the duly elected President (Joseph Biden, not Donald Trump), effected by the Education Act of 1965, or by separate executive order, for the defense of the nation in time of emergency, as such other statute as might preferably be used. Plaintiff claims that we can't all afford to be dumbasses, and debtors, like Arkansas, and etc. Plaintiff finds it useful, at this moment, to instruct all parties, as witnesses of this suit, regarding the history of Universities, and of Woodrow Wilson's likely view on the subject of academic freedom, as one of his closest advisors, America's foremost 20th century expert on Medieval European Institutions, Charles Homer Haskins, has written a book on the subject. To quote Haskins' book "The Rise of the Universities", on pages 8-9, Haskins writes, "Far from home and undefended, they united for mutual protection and assistance, and the organization of foreign, or Transmontane, students was the beginning of the university. ... The students of Bologna organized such a university first as a means of protection against the townspeople ... Victorious over the townsmen, the students turned on 'their other enemies, the professors' .. ". (Charles Homer Haskins, "The Rise of the Universities", 1923). In this fashion, guided only by the wisdom of history and posterity, all Defendants, and lawyers and judges and politicians alike, will see, it is the Plaintiff's duty to turn on them, or, more precisely, their illegal machinations, and to have his victory, despite any weak narratives and emotional or rhetorical protestations the various parties might bring to bear upon the matter. In short, Plaintiff's "re-negotiation" of the pretended contract (namely, approx. 20,000$ in student loan debt and fees) will proceed with or without the consent of "adversaries" and "enemies"; with or without their approval, or participation. But it is useful to note that a lawful, ethical, and righteous society would participate, through litigation or remediation and / or binding arbitration, and would participate in a lawful and ethical fashion. Plaintiff claims, affirms and swears, that the dodging of this suit and / or throwing this suit out, on spurious technicalities, as has frequently occurred to Plaintiff's previous suits, before, will only guarantee the failure of Plaintiff's "enemies". These uncivilized machinations, so frequently thrust upon the Plaintiff, before, will never again be tolerated by the Plaintiff, Plaintiff's family, or Plaintiff's several and various "adoptive" communities.

16. Plaintiff claims that the six AGs of the six suing states are in open rebellion against the United States of America, and he would very much like to see them confirm or deny this, both in written response, and in a verbal declaration affirming or denying this on the witness stand. Clarification of this issue would indicate if the Land Grant Act, under provision six, could recoup the funds from these "States", as the provision reads "No State while in a condition of rebellion or insurrection against the government of the United States shall be entitled to the benefit of this act.". See also, The Reconstruction Acts, or the Military Reconstruction Acts (March 2, 1867, 14 Stat. 428-430, c.153; March 23, 1867, 15 Stat. 2-5, c.6; July 19, 1867, 15 Stat. 14-16, c.30; and March 11, 1868, 15 Stat. 41, c.25)

17. Plaintiff, having sued the federal government, and several academic institutions, on several occasions, and having fled the country both during and after these lawsuits, and having sought political asylum in Canada, only to be turned back to America on grounds that he was not persecuted, or violated, or denied due process of the law, or robbed, or censored, or silenced, said Plaintiff finds himself living in tent, in a lowland rainforest, on the slopes of an active volcano, perhaps in accordance, and under purview and protection of, the Forest Charter of 1217 CE, since Plaintiff's attempt to assert Magna Cartga rights against the illegal eviction of his person and belongings, and those of his elderly mother, in 2019, in the state of Vermont, was denied, or "illegally scuttled", or ignored. If the Anglo-Saxon Forest Charter is still in effect, this is indeed some small solace, given that all of his Constitutional rights can, apparently, be denied him, brazenly, with impunity, by semantic, pedantic-jurisprudes. This most recent re-enslavement of Mr. Meyer, June 30th, 2023, follows a steady pattern of eroded civil rights beginning in 2002 (or truly, at age 14, 1994, with his choice of vocation, namely, academician and professor), and accelerating in pace and severity since his 2019 illegal eviction (and its attending confiscation and ruination of his books, papers. personal effects, and scientific apparatus), 2020 political asylum claim, and 2022 deportation (See Milton's "Aeropagitica" (1644 CE) for the value of plain English, spoken by a person asserting his free opinion, in print, in a society, and asserting his legal rights in an English speaking court of law: See Plaintiff's selected quotation, below.). Plaintiff's re-enslavement began with academic snobbery and illegal employment discrimination (circa 2002-2015, and, at least partially, ongoing), and extends up the line, to every failed American legal and political institution above that level, leaving Plaintiff no recourse, but to the court system. The problem, in academia (see Gould, quote, as follows, and in the wider culture (See "The Bell Curve", by Hernstein and Murray) for wider context) has spilled over into the political and economic realm, and thus, has necessitated judicial action, Plaintiff having exhausted other opportunities for remedy (i.e. Plaintiff, is running out of time to have a reasonable correction applied, since age 25 to 43, approx., have already been wasted by evasion and skulduggery, and there are only 20 more years for him to ask—to beg; to demand—to be allowed to be an academician before it is time for him to retire.). Again, as Stephen Jay Gould has stated, "Unfortunately, the assumption that you can do such a thing [apply a number to rank intelligence], tied to the use of such theories by conservative social ideologies, has had profoundly negative consequences for the lives of millions of people. There are millions of people, particularly in this country, who have been told they can't do this, you've been denied admission to this or that program, on the basis of a number, which was falsely interpreted as representing an intrinsic limit upon them, based on their biology, but was in fact only a measure of social influences upon their lives. So unfortunately its not funny when it's had such tragic consequences. And that's of course why we are upset over the fact that the issue seems to keep coming up. Because it has consequences, it hurts people."(Stephen Jay Gould, regarding IQ and academia, VHS video, 1995). And Plaintiff also offers up Milton's opinions, from "Aeropagitica", (1) " ... but when complaints are freely heard, deeply consider'd and speedily reform'd, then is the utmost bound of civill liberty attain'd, that wise men look for.", and (2) "when a man writes to the world, he summons up all his reason, and deliberation to assist him; he searches, mediatats, is industrious, and likely consults and conferrs with his judicious friends; after all which done he takes himself to be inform'd in what he writes, as well as any that writ before him; if in this the most consummat of his fidelity and ripenesse, no years, no industry, no former proof of his abilities can bring him to that state of maturity, as not to be still mistrusted and suspected, unless he carry all considerat diligence, all his midnight watchings, and expence of Palladian oyl, to the hasty view of an unleasur'd licenser, perhaps much his younger, perhaps far his inferiour in judgement, perhaps

one who never knew the labour of book-writing, and if he be not repulst, or slighted, must appear in Print like a punie with his guardian, and his censors hand on the back of his title to be his bayl and surety, that he is no idiot, or seducer, it cannot be but a dishounour and derogation to the author, to the book, to the priviledge and dignity of Learning.". Plaintiff claims that such censorship, such ostracism, such torture, and efficaciously exacted "chilling effects", exacerbated by these most recent actions of the Defendants, are not a necessary or beneficial part of the attainment of higher education, in the 21st Century, in a "free" country.

18. To such disingenuous arguments that the Plaintiff and Plaintiff's counsel (Pro Se) expects to see, regarding "American Freedom", and the supposed, assumed, axiomatic impossibility of enslavement of, by, or within the American system, Plaintiff claims that recent prosecutions in Immokalee, Florida, and elsewhere in the country, have illustrated an increasing boldness of slave owners, and of neo-aristocrats, and of "ersatz aristocrats", in America, a boldness that, until now, was probably confined to domestic industries and agricultural workers. Relevant case law from the Justice Department and arising out of the Immokalee suits, include, U.S. vs. Flores 1997; U.S. vs. Cuello 1999; U.S. vs. Tecum 2001; U.S. vs. Lee 2001; U.S. vs. Ramos 2004; U.S. vs. Ronald Evans 2007; U.S. vs. Navarrete 2008; U.S. vs. Bontemps 2010; U.S. vs. Global Horizons 2010. Plaintiff also, herein, alludes to FBI studies (later dealt with more specifically) of white collar crime, including wage theft and identity theft, as a burgeoning problem in the 21st century (and an undeniable economic opportunity for some persons!), with the amount being a staggering $400 billion per year, dwarfing the amount of standard, violent theft and burglary, a mere $400 million per year. Plaintiff suggests that attempted re-enslavement confisicates a large amount of National GDP, yearly, lost and incalcualable, as the potential of the youth of America is not easily measured, and the real dollars and value created by persons thus abused will always remain unaccounted for in FBI studies. White collar theft from white collar workers, thus abused, enslaved, as Plaintiff has been, is not a problem that the FBI seems interested in quantifying, or investigating, whereas, the "Immokalee cases", more easily grab headlines, and are quantifiable and measurable, and are addressed in more easily-indictable ways.

19. Plaintiff claims that, contrary to popular belief, one Mr. Alexander Hamilton was not a rapper, dancer, and / or freedom fighter, but was, instead, the instrument of interested parties, and designer of a debt-peonage system (since, properly, outlawed, circa 1867 CE, by 42 USC § 1994) that saw the financial ruination of the soldiers and farmers who sold their continental scrip for pennies on the dollar, while the bondholder class was "made whole" (see Zinn, 1990, "A People's History of the United States", and Ronald Chernow's, "Alexander Hamilton", 2005). Plaintiff further claims that this act, amongst many others in early American history, set the tone and has, improperly allowed, on occasion, debtor "States" like Arkansas, a state that almost ruined the Smithsonian Institution, and a "State" that was fiscally insolvent and involved in a series of bond schemes from its entrance into the union in 1846 right on up into 1903, and beyond, with a further budget failure in the 1920s, to illegally shift their obligations and debt burden to the citizens of their "state", and to citizens of other states, in egregiously illegal violations of the Constitution. The humor of the youth of America taking lessons on debt from such an irresponsible fiscal party as the "State" of Arkansas, is beyond ridicule, parody, satire or mockery; but it is not beyond judicial reach, or executive action, for remediation, review, abrogation, or to "modify" or "waive", as the Heroes Act of 2003 specifically cites. Parody or satire will not suffice: only judicial action and / or executive action can correct the overstep of the "States" and correct the negligent inaction of the national legislature; both of these actions (and inactions) of both of these parties are egregious violations of citizens' rights, and of the

wise separations of powers, as set up by the founders, and inherent in the "plan and frame of the Constitution", as agreed to, even by the "State" of Arkansas, the second time they were invited to be a member of our civilization (via the Reconstruction Acts).

20.  Plaintiff claims that at least one Defendant is "the pot calling the kettle black", as it has been a debtor state, and an ignorant reactionary actor, since its inception, twice, into the Union. The case of Arkansas and the missing Smithsonian money is an infamous one, dating back to the creation of the state, in the shadow, and foreshadow, of the fiscal panic of 1837. Massachusetts, and in particular, former president and then Senator John Quincy Adams, made good on the promise of the nation, to establish a scientific foundation, the Smithsonian. The money that Arkansas so brazenly and foolishly squandered was replaced and reapportioned by the more civilized and ethical and law abiding denizens of the country, at large. Their lesson in fiscal insolvency was not learned in this early escapade, as Arkansas was quickly embroiled in the Civil War nonsense, and, then, through the Reconstruction Acts agreed, again, a second time, to the "plan of the Constitution", subjecting them to suits in Federal Courts, on Federal questions, from citizens--for instance--that they might try to enslave, or deny equal protection under the 14th amendment. Furthermore, their bond and fiscal troubles did not stop there, as they were ensnared in the Holford Bond fiasco that wasn't properly settled until 1906. One might think lessons had been learned here, as well, but further ignominy and shame and embarrassment would be lumped on the unfortunate denizens of this "State", when another bond scandal, beginning in 1920, culminated in the 1933 default of Arkansas, the only post reconstruction default of a state and the only one in modern history. Accepting economic advice from Arkansas, even imagining that such a thing were constitutionally possible, given that the Contracts Clause explicitly forbids Arkansas' interference in the contracts between two private parties, namely, Plaintiff, and "student loan servicers", would be, unwise, to say the very least. Plaintiff claims, here, violation of the contracts clause by, at least Arkansas, and also several logical fallacies, tu quoque and "pot calling the kettle black" fallacy. Plaintiff claims that the other five states are similarly ill-disposed to issue financial advice, given their "limited worldview" and intellect. (Reconstruction Acts : March 2, 1867, 14 Stat. 428-430, c.153; March 23, 1867, 15 Stat. 2-5, c.6; July 19, 1867, 15 Stat. 14-16, c.30; and March 11, 1868, 15 Stat. 41, c.25 )

21. Plaintiff claims he does not know who his student loan service provider is, since he was illegally evicted and all his personal papers were stolen and / or ruined, in 2019 (an action that he specifically decried in his response to the judge; an action he specifically demanded be stopped. To wit, if Plaintiff lacks the paperwork, the Vermont judge, and the "landlord" are the ones at fault.), and furthermore, Plaintiff is not allowed to receive mail, because he lives in a lowland rainforest, on the slopes of an active volcano (as it turns out, "... neither rain, nor sleet, nor snow, nor hail..." will disrupt their normal rounds, but a molten rock river, a little bit of flying ash, and occasional sulphurous gas emissions, and the mail carriers develop all sorts of "qualifying sub-clauses", and loopholes to their poetic mission statement), and furthermore, he is not allowed to work as a biologist, and earn money, so he cannot even imagine a way to obtain a bill in the mail, much less pay one with suitable paper cash, or digital cash, and furthermore, Plaintiff completely disputed the validity of the entire debt, back circa early 2010s, when the instrument in question allegedly defaulted, and Plaintiff verbally nullified the debt, at that time, since his complaints about illegality were not heard, or considered, and furthermore, Plaintiff considers, still, presently, that the debt is completely illegal and invalid. The Department of Education has, provisionally, and temporarily, brought the alleged loan out of default, and brought it current, pending a determination of some partial forgiveness or some re-

negotiated partial payment plan, to which, Plaintiff will, here, go on record as completely rejecting, out of hand. Plaintiff does not owe any of this sum. Plaintiff is owed his day in court. Period. End of story. Plaintiff further claims here, he has never set foot in Missouri, or Nebraska, or Arkansas, or any of these other "Shithole States", and Plaintiff has never, to his knowledge, entered into contract with MOHELA, and has been blissfully unaware of MOHELA's existence, until about one month ago (approx. September 2023), and has never , to his knowledge entered into any contract with the State of Missouri, or any of its entities or sub-entities, or quasi-governmental instruments, and further Plaintiff denies that any laws local to these areas can possibly affect him, since his day in court, Federal Court, to face his accusers (silent denouncers, libelers, and slanderers; credit-ruiners), have been routinely, and viciously, maliciously, denied, and his right to dispute the validity of the debt in court has been denied, and furthermore, his right to "divorce" himself from the lawlessness (in this particular matter) of the USA (i.e. surrender citizenship, and / or claim political asylum in Canada) was denied. If it is found that Mr. Meyer's alleged debt instrument, as guaranteed and /or efficaciously administered by the Education Department is indeed owned by MOHELA and / or Missouri, and / or one of the other aforementioned "Shithole States", there still, remains the matter of the (1) impossibility of wages being paid to one whose slavery (re-enslavement) is consented to by all governing parties (at all levels of the US government), (2) impossibility of receipt of postal mail by said slave, due to his physical location / physical residence being denied, unrecognized, or opposed by various government entities (despite Plaintiff's forced re-entry into America, a process that Canada was satisfied to oversee, when he boarded his plane flight to Hawaii; his deportation papers are not acceptable proof of residency, for banks or mail, in the State of Hawaii), (3) impossibility of payment of said bill, given that said slave cannot obtain a bank account without a valid address (i.e. one that is more specific than "tent-on-a-rainforest-slope-of-a-volcano, HI"), (4) inability of said slave to even enter into contract, or even to sue (please note that Sam's Antics Incorporated (2004, a State of Rhode Island granted corporation) is listed as co-Plaintiff, and thus, even if this court rules that Mr. Meyer's enslavement is perfectly legal, there still is a Plaintiff listed on this suit that has standing to sue, and that was harmed by Defendants' illegal actions.), and, finally, one must also note (5) the extreme negligence of MOHELA and / or any other entity (whichever entity presently claims to own a legitimate debt instrument governing Mr. Meyer) in recouping this debt, since, the quickest way to do so would be to capture (i.e. offer "employment" to) said slave, and force him to work his particular skillset, in exchange for the value produced by said skills, which then could be sold for money, and thusly returned, as liquid value, currency, to MOHELA and / or the student loan provider in question, and in this fashion, said "legitimate debt owner" could then find themselves paid back for the money they allegedly invested in the provisioning of a skillset for said slave. Plaintiff claims that these entities are profoundly disingenuous and not at all interested in recouping their alleged investments, but instead, they perversely and maliciously enjoy holding the debt instruments as a tool of social, political, emotional, and fiscal control. Plaintiff further claims that the concrete actions that these traitors take, in the public, in the financial and legal world, when viewed as disingenuous and not possibly reasonable or rational, suggest that Defendants actions are direct attempts to enslave the persons that they claim to be helping, through their provisioning of credit for the purposes of financing of "higher education". This is illegal. The negligence in recouping their own investments--negligence by MOHELA and / or Missouri and / or the other "shithole states" and / or their AGs and / or their quasi-governmental instruments and agencies--such negligence is not the responsibility of the alleged "slave", or Plaintiff. Plaintiff will offer one minor concession here, the only compromise he is willing to make: if it can be shown that MOHELA or one of the named Defendants does indeed own a debt instrument that can arguably be ascribed to Plaintiff, and Defendants can prove it, in a

court of law, Plaintiff offers to work a half year, as an evolution biologist, at USBOL approved statistical mean salary, and Plaintiff will surrender such value as is produced, directly to them, in exchange for complete negation, and satisfaction, of the said debt instrument. If they will not take this payment, they will get nothing. Plaintiff affirms and swears this. Plaintiff further reminds "civil society", as represented in this matter by this court, that, if he is not offered a fair day in court, to meet his accusers, and if he is not paid his back wages and salary, Plaintiff will make it his life's mission to recoup the funds, from the state, and from federal entities, and from "civil society", if he has to borrow one paperclip from every state and federal office, from here unto Poughkeepsie and Kalamazoo, in order to recover the money that the state and the civil society, and the traitorous AGs, have stolen from him. In the matter of this "extra-judicial re-negotiation" it is instructive to read a page, or two, from history, regarding the occasional injustice of the American courts, and the ease with which a "street re-negotiation" can take place. Howard Zinn (and Charles Beard, whose work he summarizes, revises and extends) describes the context within which the drafting of the U.S. Constitution arose as one involving just this sort of "street negotiation", with pages 86-92 being particularly enlightening and instructive on the matter. This description of the immediate precipitating events, Shay's Rebellion, and of the context given by Beard's "An Economic Interpretation of the Constitution", is offered, thusly: "By 1787 there was not only a positive need for strong central government to protect the large economic interests, but also immediate fear of rebellion by discontented farmers. The chief event causing this fear was an uprising in the summer of 1786 in western Massachusetts, known as Shays' Rebellion. In the western towns of Massachusetts there was resentment against the legislature in Boston. The new Constitution of 1780 had raised the property qualifications for voting. No one could hold state office without being quite wealthy. Furthermore, the legislature was refusing to issue paper money, as had been done in some other states, like Rhode Island, to make it easier for debtridden farmers to pay off their creditors. Illegal conventions began to assemble in some of the western counties to organize opposition to the legislature. At one of these, a man named Plough Jogger spoke his mind: "I have been greatly abused, have been obliged to do more than my part in the war; been loaded with class rates, town rates, province rates, Continental rates and all rates . . . been pulled and hauled by sheriffs, constables and collectors, and had my cattle sold for less than they were worth. . . . The great men are going to get all we have and I think it is time for us to rise and put a stop to it, and have no more courts, nor sheriffs, nor collectors nor lawyers. . . . ". The chairman of that meeting used his gavel to cut short the applause. He and others wanted to redress their grievances, but peacefully, by petition to the General Court (the legislature) in Boston. However, before the scheduled meeting of the General Court, there were going to be court proceedings in Hampshire County, in the towns of Northampton and Springfield, to seize the cattle of farmers who hadn't paid their debts, to take away their land, now full of grain and ready for harvest. And so, veterans of the Continental army, also aggrieved because they had been treated poorly on discharge—given certificates for future redemption instead of immediate cash—began to organize the farmers into squads and companies." (Zinn, 1995, pg. 87). Zinn continues the narrative, "One of these veterans was Luke Day, who arrived the morning of court with a fife-and-drum corps, still angry with the memory of being locked up in debtors' prison in the heat of the previous summer. The sheriff looked to the local militia to defend the court against these armed farmers. But most of the militia was with Luke Day. The sheriff did manage to gather five hundred men, and the judges put on their black silk robes, waiting for the sheriff to protect their trip to the courthouse. But there at the courthouse steps, Luke Day stood with a petition, asserting the people's constitutional right to protest the unconstitutional acts of the General Court, asking the judges to adjourn until the General Court could act on behalf of the farmers. Standing with Luke Day were fifteen hundred armed farmers. The judges adjourned.".

Plaintiff claims that no man who counts himself literate or civilized—or legal or ethical—can ignore the ease with which a travesty of justice—an illegal court ruling—can be renegotiated by those whose interests it has brazenly ignored, or has actively driven to catastrophic ruination.

22. Plaintiff claims that Defendants did conspire to violate the U.S. Constitution's prohibition against Titles of Nobility (U.S. Const. art. I § 9, cl. 8.). Plaintiff claims that U.S. History, nearly everywhere it is taught, is incorrect. The "Robber Barons" of the Gilded age were actually the second set of aristocratic usurpers who angled their way, in opposition to the new Democratic and Republican way of governance. The "Ersatz Nobility", the "Early Robber Barons", not blooded, or titled, but landed and monetarily fluid, and contractually bonded to their sources of wealth, manifested in such characters as Astor, Vanderbilt, and DuPont, and manifested in the wealth dynasties they founded. Plaintiff further claims that the actions of Defendants are blatant attempts to enrich these untitled nobles, their heirs, both intellectual and, sometimes, blood heirs, in both direct and indirect violation of the constitutional provision prohibiting establishment of such dynastic wealth and privilege by such lawless means, and resulting in such lawless socioeconomic stratification, and inherently unequal access to justice, law and order, as might be expected to be produced by such a lawless state of affairs. U.S. Const. Art I. § 9-10, U.S. Const. Art IV § 4 .

23. Plaintiff, Mr. Randall Kelly Meyer, did invent and / or discover what he has titled "Meyer's Optical Approximation of the Human Eye", (MOAHE), a factual, empirical, scientific truth that Defendants, while wholly incognizant of it, are nonetheless required to acknowledge as legitimate scientific work, and deserving of monetary remuneration, as befits a person residing in a "non-slaveholding" nation. In such a theoretical paradigm, the human optical and visual apparatus is stylized and typified, and assumptions are made regarding what parameters must be reproduced by an artificial camera system in order to accurately and precisely simulate and emulate the human visual and optical system. Chief among these parameters are (a) an assumed 120 degrees Field of Vision, or 60 degree half angle, similar to the human measure (see Davson, 1988, "Physiology of the Eye"), (b) an assumed near point of 12.5 cm (estimate for the young human eye, taken from Hecht, "Optics", 2001), (c) an assumed far point of accommodation of, approximately 1 meter—and subject to pupil size, and thus, to lighting conditions—or 3 meters or 5 meters, after which, the optical system, like the human optical system, is focused to infinity, (d) an assumed hemispherical-to-three-quarter-globe, curved photosensitive surface, either of CCDs/CMOS imagers and/or of FOICs (Fiber Optic Image Conduits, see Hicks 1962, USP # 3,033,071; and see O'Brien, Brian , JOSA articles circa 1950s; and see Hecht, Jeff, "City of Lights: The Story of Fiber Optics") arrayed on a surface with radius of curvature of exactly 12.7 mm (considering that the human eye scleral and retinal globe is approximately 22 mm. in the x and y directions, and about 24-26 in the z direction; namely, a slightly elongated spheroid of about a 1 inch diameter) (e) a photosensitive surface of at least 95 million elements (Curcio et. al. 1991; revised and improved from Osterberg's, 1935 estimate of 125 million, approx., cone and rod cells), sampling a "retinal" image of at least 25 million elements (i.e. 4 pixels per "light spot", in keeping with the Nyquist frequency standards for spatial sampling during image capture and reproduction), (f) an optical system comprised of four elements, or some cemented combination of four elements, made of materials matching as close as possible to the refractive indices and dispersion characteristics as the actual human eye (see, for example, Navarro, 1985, JOSA article, or the Nobel-worthy research of Alvar Gullstrand, circa 1890s through 1910s), with the third element (CALV: Cornea, Aqueous Humor, Lens , Vitreous Humor) having some means or mechanism by which the curvatures or indices can be altered, either electro-wetting, shape change, or fluid cavity flushing with different refractive index fluids, or similar such

measures, so as to affect the equivalent, or near equivalent, results of the human accommodation mechanism, (g) a mapping of the image points on the typified retina, onto the object points of the object field, taking into account the Nyquist frequency, i.e. namely, four "pixels" per light spot, providing twice the spatial frequency of collection to that which is to be reproduced, and, further mapped into the Euclidean 3 dimensions, via the aforementioned 120 degree cone of the visual field, and in the object space sliced by the plane of the ground, providing a hyperbolic conic section, via the equations of Appolonius of Perga (circa 200 BCE), and via the analytical geometry of Descartes, and the al-gebra (surely, as Defendants might maintain, a "Muslim Plot", if ever there was one!) of the Arabic scholars of the Middle Ages and with the 95 million (maximum; but possibly 95 million / 4 = 24 million, approx., due to Nyquist sampling considerations) object points mapped onto 95 million image points (24 million approx.) of the retina, with some 95 million or so pixels on the "robot retina", with various Depth of Field, pupil size, illumination levels and accommodation states accounted for and modeled, with the final intention being, of course, (h) provision of a 1:1 working scale model of the human eye, (i) analysis of the eye model, thus far described, and its resulting resolution with the measured vales of the functioning human eye, as detailed by Th. Wertheim (1891 CE), and translated from the original German by Dunsky (1985 CE). Call it an "Anthropoid Eye" standard, if you will. Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand.

24. Plaintiff, Mr. Randall Kelly Meyer, did invent and / or discover what he has titled "Meyer's Robotic Eye", (MRE), a factual, empirical, scientific truth that Defendants, while wholly incognizant of it, are nonetheless required to acknowledge as legitimate scientific work, and deserving of monetary remuneration, as befits a person residing in a "non-slaveholding" nation. The plan for this visual transducer, or "eye", or "camera", at present, in its various stages of repair and construction, includes, but is not limited to (a) usage of lens elements of low refractive index, i.e. less than 1.5, and more to the point, 1.4 or lower, (b) possible usage of some some liquid lens elements of low refractive index, (c) possible usage of crystal or polymer elements of similarly described low refractive index, with examples being LiF, MgF2, CaF2, and several known fluoropolymers of suitable refractive index and dispersion values (d) usage of either FOIC or CCD / CMOS Goldberg Polyhedra abutted arrays, at least a hemisphere in extent, perhaps stretching to a three-quarters-globe model, (e) several "manufacturing optimized" versions of said apparatus, (f) microlens arrays, overlaying the FOICs, if used, and corrected for our Nyquist sampling equations (g) optimized color filter arrays and, in general, hexagonal CCDs or CMOS imagers as might be deemed suitable in a custom made chip, in preparation for "Goldberg Polyhedra" abutting, (h) flexible choice of either CCD or CMOS, and either full frame transfer or interleaved array, and either back illuminated devices or front illuminated, as the custom design might deem appropriate or necessary, (i) suitable "fast memory", namely, DRAM, as in the 1980s and 1990s paradigm of 6-fold savings in transistor count for a reasonable exchange in decreased speed, with respect to SRAM, but not limited to such strategies, as a dual port RAM, or large FIFO chip, might be just as efficient and/or effective,  (j) a USB controller, to store FIFO or DRAM data onto long-term, durable, flash memory storage, and to interface with ease, with the rest of the A.I. system Plaintiff is designing. Plaintiff's design is not limited to these features, as Plaintiff has been studying this for 20 years, and has many hypotheses that need testing, (k) finally, an outline of the optical system elements, thicknesses, radii, and diameter of clear aperture will be summarized, though not necessarily finalized, here, namely, a "corneal" element of radius R1 = 7.72 mm. R2 =6.5

mm. t = 0.5 mm., and Phi = approx. 8 to 12 mm. ; "aqueous" element R1 = 6.5 mm. R2 = variable 10.2 mm. to 7 mm. t = approx. 3 to 3.5 mm. and phi approx. 8 mm. ; "lens" element R1 = variable 10.2 to 7 mm. R2 = approx. -7.5 t = variable approx. 4 mm. To 4.5 mm. Phi = approx. 8 to 10 mm. ; "vitreous" element comprise the remainder of the "globe" (possibly liquid, but abutting the Goldberg Polyhedra retina). Defendants are simply the latest in a long string of persons and organizations and institutions that have denied the Plaintiff his right to attempt to study these devices, to think these thoughts, and to act upon them in the public, in the market, in the lab, and in the press. Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand.

25. Plaintiff, Mr. Randall Kelly Meyer, did invent and / or discover what he has titled "Meyer's Massively Parallel Anthropoid Olfactory and Gustatory Transducer" (MMPAOGT), a factual, empirical, scientific truth that Defendants, while wholly incognizant of it, are nonetheless required to acknowledge as legitimate scientific work, and deserving of monetary remuneration, as befits a person residing in a "non-slaveholding" nation. The plan for this olfactory and gustatory transducer, or "nose", or "tongue", at present, in its various stages of design, repair, and construction, includes, but is not limited to (a) a Massively Parallel Surface Acoustic Wave Olfactory Transducer, rendered chemically sensitive by polymer mass-loading anthropoid receptor analogs, wafer scale, on a 4-inch diameter quartz (or other suitable substrate, i.e. lithium niobate, lithium tantalate, or various other appropriate crystal structures) wafer, optimized for an anthropoid "olfactory gamut", with integrated or hybrid microfluidic (or other suitable technology) olfactory "shutters", overlaying many redundant arrays, and a wear leveling algorithm governing the opening of these shutters as the irreversible chemical loading within each individual array renders them insensitive to additional odorant, (b) Massively Parallel Fiber Optic Image Conduit Olfactory Transducer, rendered chemically sensitive with fluorescing anthropoid receptor analogs, presumably, more fast-acting than the SAW design (awaiting more study), with an anthropoid "olfactory gamut", and with an integrated or hybrid microfluidic (or other suitable technology) olfactory "shutter', overlaying many redundant arrays, and a wear leveling algorithm governing the opening of these shutters as the irreversible chemical loading within each individual array renders them insensitive to additional odorant (c) similar apparatus as -(a)-, yet optimized for gustatory, liquid sensation, modality, (d) similar apparatus as -(b)-, yet optimized for gustatory liquid sensation modality, (e) characterization of the anthropoid olfactory and gustatory gamut, as sensed, and as described in the literature, and with datasets organized by Plaintiff (a task to be attempted in this coming decade), (f) "Top Down" analyte gamut definition, namely, description of all the specific FOIC or SAW receptor analog chemicals necessary to affect speedy and accurate sensation of real world analyte spectra (this research--beginning with a description of analyte molecules sensed by the human animal and arguing "down" towards the necessary receptor analogs—is to be undertaken by Plaintiff in this next coming decade) (g) "Bottom Up" analyte analysis, namely, definition of the all the specific FOIC or SAW receptor analog chemicals necessary to affect speedy and accurate sensation of real world analyte spectra (this research--beginning with a description of the human Olfactory Receptor Genes (hORGs) and Olfactory Receptor Proteins (hORPs), and their functional behavior, with respect to various known odorants, and arguing "up" towards the necessary receptor analogs—is to be undertaken by Plaintiff in this next coming decade), (h) Olfactory and Gustatory Bitmap file structure specification, a partially completed task (See Plaintiff's github page "LadnarofLadner" for details of Plaintiff's work in this area), with option to expand into ".olf4" or "ol4" files, for "olfactory movies" or, rather, bitstreams, (possibly

already encoded into the mp4 type bitstream standard) by (i) "Bottom Up" analysis, is expected to take place in the coming decade, necessarily, and may remain somewhat incomplete, considering the recent date of the decoding of the human genome (first, circa 2000-2002 and again, the final 5% of the code, as published in April 2022 *Science*), and the slow and deliberate and painstaking work of the "de-orphanization" of the 450 QTY., or so, hORGs / hORPs. (j) four final, or nearly final, devices and / or plans being the goal and result of the next ten years of work, Mr. Meyer claims priority for the first "Massively Parallel Anthropoid Olfactory and Gustatory Transducer" (MPAOGT), and much like Lee Boysel's legitimate claim to historical precedence for making the microprocessor a physical reality, Mr. Meyer can already claim as much, despite the lack of follow-through, at present, and despite the lack of efficient "reduction to practice", at present. Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand.

26. Plaintiff, Mr. Randall Kelly Meyer, is of the considered—and more importantly, legally actionable—intellectual and academic opinion, that the Western hemisphere is philosophically naive, and thus, logically and epistemologically handicapped, and Plaintiff further considers this a factual, empirical, scientific truth that Defendants, while wholly incognizant of it, are nonetheless required to acknowledge as a highly refined academic opinion, and deserving of monetary remuneration, as befits a person doing expert work, and residing in a "non-slaveholding" nation. As evidence of this position, Plaintiff argues that Darnell Rucker in his book "The Chicago Pragmatists" (1969 CE) has cited Pragmatism as the one and only school of philosophy founded in the Western hemisphere (note, Charles Sanders Peirce, the founder of this school, distanced himself from its later luminaries, J. Dewey and W. James, and re-labelled his own work as "Pragmaticism"). While, one could quibble about Native American "animisms", and about Harvard's brief dalliance with Transcendentalism, the remaining schools of thought arising in the West tend to have artistic focus like "Magical Realism", in South American 20th century literature, or "Post-Modernism" in sculpture, architecture, poetry, etc. Plaintiff argues that Rucker's position was a correct position, but, in light of certain late 20th and early 21st century developments, one can consider that a new "branch" of Western "Philosophy" has opened up, one separate from the two main branches established in the High Middle Ages in Europe, after the rediscovery of Aristotle's and Plato's work, and after that fundamental division which split European philosophers into two camps; the Continental Rationalist and Analytical Empiricist schools. The Americans have, as of late, founded and implemented, quite unconsciously in most cases, Hedonism, Objectivism, Thelemite Occultism (Crowley-ism, rather, mysticism, and drug and sex hedonism), Scientology/Mormon/other-cults, conspicuous consumption "cargo cult" beliefs (See Thorstein Veblen, 1899), "hucksterism", fiat currency-ism, Monetarism, anarchy (violent in nature, i.e. not the "good kind", or ethically neutral, anarchy) and various other forms of nihilistic predilections that, while not really providing a "point and counterpoint" challenge to the academic branches of philosophy, they are nevertheless so prevalent in the culture, and in the globalized, overpopulated world culture (seeking to be more "American"), as to be functionally equivalent to the "working philosophy" of humanity. This, Plaintiff suspects, is a bad development. Plaintiff would like to hear the Defendants opinion on the matter, but does not expect them to understand it, or add any useful insight into the matter, and, anyway, Plaintiff has used up all his "big words" for today, and he figures its probably snacktime or naptime for Defendants. Bless their little hearts. One additional possibility, though of slight probability, is that "Americanism" itself (i.e democracy, freedom, internationalism, mercantilism-capitalism), is the natively developed and governing

philosophy of the Western hemisphere, and thus of the modern global "Zeitgeist", but Plaintiff finds the evidence for this view to be rather weak and meager, "Junto" and American Philosophical Society and National Academy of Sciences notwithstanding. It bears remembering that America was cruel and unjust to its finest philosopher, Charles Sanders Peirce, discoverer of functional completeness and presage to computer science and the use of electromagnetic switching to affect electronic logic; and father to the one and only school of professional philosophical thought, native to the Western Hemisphere. In short, if "Americanism" (freedom, democracy, meritocracy, etc) is, or was, the governing philosophy, where were those principles, in action, in the case of C.S. Peirce? . Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand. (See "Peirce Rustled, Russel Peirced", by Anellis, Irving, 1995, for additional information on the value and priority of Peirce's early symbolic logic.)

27. Plaintiff, Mr. Randall Kelly Meyer, did invent and / or discover what he has titled "The Meyer-Hardy-Weinberg Equilibrium", (MHWE or MHWL), a theoretical device, substantiated by a body of scientific facts, that Defendants, while wholly incognizant of it, are nonetheless required to acknowledge as legitimate scientific work, and deserving of monetary remuneration, as befits a person residing in a "non-slaveholding" nation. This extension to the already well know, fundamental law of evolutionary theory, i.e. The Hardy-Weinberg Equilibrium, or alternatively, the Hardy-Weinberg Law, applies only to animals possessing "culture" or "cultural evolution". The five major means by which genetic frequencies under Hardy-Weinberg are transmitted down through the biological generations, are supplemented by a sixth mechanism in the Meyer-Hardy-Weinberg application, namely, cultural evolution can affect gene frequencies in subsequent, descendant generations. Yet, similarly, gene frequencies can also affect "meme frequencies" (memes being, here, only inchoately defined as "approximations to Humean / Lockean "Impressions" and "Ideas" ") in subsequent generations, though it is presumed to be, to a far lesser extent, and certainly less of a causal connection than in the first case. This is well known in the fields of Biological Evolution and Cultural Anthropology, and in Cultural Evolution Studies, as cultural characteristics undergo lateral transmission in addition to the vertical transmission of traditional genealogies. Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand.

28. Plaintiff, Mr. Randall Kelly Meyer, did invent and / or discover what he has titled the "Meyer-Humean Set Memetic Theory", (MHSMT), a theoretical device, substantiated by a body of scientific facts, that Defendants, while wholly incognizant of it, are nonetheless required to acknowledge as legitimate scientific work, and deserving of monetary remuneration, as befits a person residing in a "non-slaveholding" nation. The MHSMT merely applies the philosophy of Hume and Locke, to the computer age, namely, the acquisition of Impressions and Ideas by an intelligence, either natural or artificial, is modeled and embodied in a computer architecture whose software, and largely off-the-shelf parts, interface with Anthropoid sensory structures, i.e sensory transducers (at least 5 five in number). Plaintiff further proposes the plan and outline of an A.I., built with cheap SBCs (Single Board Computers), microprocessors, and / or microcontrollers, designed with this exact theory in mind; designed to produce ideas, or rather, memories of specific impressions collected, and processed for easy retrieval and reference, and

easily manipulated and utilized as "ideas" and / or "memes", for the purposes of intelligent verbal and / or linguistic expression, communication, and / or physical-world investigation and exploration and query; Meyer's (Linguistic) Law is the centerpiece of the putative A.I. At this point, Plaintiff finds it instructive to remind all parties of Hume's initial work, "A Treatise of Human Nature", and, if we, perhaps, excise the references to "emotions", we find the concepts he promulgates to be surprisingly modern. Hume, in his first work, as a young man of 24 years, wrote in BOOK I. "Of the Understanding", PART I. "Of Ideas, Their Origin, Composition, Connexion, Abstracton, Etc.", SECT. I "Of the Origin of our Ideas.", that "All the perceptions of the human mind resolve themselves into two distinct kinds, which I shall call IMPRESSIONS and IDEAS. The difference betwixt these consists in the degrees of force and liveliness, with which they strike upon the mind, and make their way into our thought or consciousness. Those perceptions, which enter with most force and violence, we may name impressions: and under this name I comprehend all our sensations, passions and emotions, as they make their first appearance in the soul. By ideas I mean the faint images of these in thinking and reasoning; such as, for instance, are all the perceptions excited by the present discourse, excepting only those which arise from the sight and touch, and excepting the immediate pleasure or uneasiness it may occasion. I believe it will not be very necessary to employ many words in  explaining this distinction. Every one of himself will readily perceive the difference betwixt feeling and thinking.". This should be a sufficient enough explication of Plaintiff's intentions in equating, or nearly equating, Hume's conception of impressions and ideas, with Dawkins version of the meme, or even, Aritstotle's or Semon's "mneme". Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand.

29. Plaintiff, Mr. Randall Kelly Meyer, did invent and / or discover what he has titled the "Meyer's Standard Strong Artificial Intelligence Directories", (MSSAID), a theoretical device utilized in the creation of Strong Artificial Intelligence, to wit, an anthropoid simulation of the sensory process of the human animal, that Defendants, while wholly incognizant of it, are nonetheless required to acknowledge as legitimate scientific work, and deserving of monetary remuneration, as befits a person residing in a "non-slaveholding" nation.  Plaintiff describes, briefly, an extension to the File Hierarchy Standard (FHS) of Linux Standard Base (LSB), namely, five folders( /olf, /gust, /vis, /aud, /tact ), found at the "root' directory, AKA " / ", and designed to hold impressions and ideas from the five Humean sets collected by the five sensory transducers of the putative A.I., under test. Found in each of these folders will be the original native "RAW" file, for each respective sensory transducer, as a representation of the Humean "impressions", and as a "sensory archive" holding the canonical memory of the raw bitstream, as well as several "discretized" files, or "memes" or "ideas", in the Humean sense. Associated with these "meme" files, might also be some kind of journaling system, as a running tally, timestamped, of discretized ideas, as they occur, in real time, with the journaling file being useful for reconstruction of events after a system crash, as is well known in the art and science of Linux programming, already. Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand.

30. Plaintiff, Mr. Randall Kelly Meyer, has performed significant theoretical and philosophical and historical work on the theory of evolution, and of cultural evolution, namely, in tying together

the works of Frege, Peano, Peirce, Russel, Woodger Sr., Woodger Jr., Turing, and the rest of the Artificial Intelligence, computing and biological, genetics, and evolution biology communities, an activity and action that Defendants, while wholly incognizant of it, are nonetheless required to acknowledge as legitimate scientific work, and deserving of monetary remuneration, as befits a person residing in a "non-slaveholding" nation. Mr. Meyer's work on the formalization of scientific theories has consulted most of the relevant work published, to date, including Woodger, Williams, Lloyd, Thompson, Rosenberg, Hull, Ruse, Ghiselin, Gould, and many others. Mr. Meyer, in summary, supports syntactic theories of evolution biology, over the semantic conception, but is fluid and inchoate in his application, preferring to focus on the content, and double-blind verification (or, rather, non-falsification, via Popper's standard), of the theories rather than their strict non-contradictory cohesion. But this lawsuit is certainly not the place to get into the particulars, as the debate is probably interminable, or nearly so. Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand.

31. Plaintiff respectfully reminds the court that, following Lochner v. New York, (1905), Meyer v. Nebraska extends, or rather specifies, that rights protected by the 14th Amendment are assumed to denote "... not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship [sic, or not worship] God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men," Meyer v. Nebraska, 262 U.S. 390, 399 (1923). All of these rights, Plaintiff contends, are most egregiously interfered with, illegally, by Defendants, in their several recent suits, culminating in the improper Biden v. Nebraska 2023 decision.

32. Plaintiff claims the Defendants are traitors, within the strict definition of 18 U.S.C. § 2381 and Plaintiff's requests, and directs, this court to issue a write of mandamus, forcing the Biden administration and /or the Justice Department (See Plaintiff's previous complaint and investigation with the justice department, USDOJ complaint and response (2020) # 171374-MGG ) to investigate the principal actors, and associated parties, as those executive departments may see fit, to wit, additional parties such as The Federalist Society, The Republican Attorney General Association, The Republican Party, etc. Plaintiff further requests investigation of the several military and former military members listed as Defendants in this action, within the prescribed and relevant portions of the Uniform Military Code of Justice, up to and including removal of military pensions for persons convicted of treason, or lesser offenses, such as libel or slander, or attempted slavery, of the Plaintiff. Plaintiff further requests that, if the various departments and officers of the executive branch have any questions concerning Mr. Meyer's allegations, that they first direct them to experts in the field of "treason studies", one Mr. Regan Meyer, Plaintiff's father, and second, to Mr. Meyer's (Sr.) former supervisor at "The Phone Company", one Dennis Conti, formerly of the U.S. Army, circa 1968 (either Company C, 1st Battalion, 20th Infantry Regiment and Company B, 4th Battalion, 3rd Infantry Regiment, 11th Brigade, 23rd (American) Infantry Division), thirdly, to one Seymour Hersh, a well-known investigative journalist, and fourthly, sadly, one who cannot speak for his actions, one disgraced General Colin Powell, investigator—and noted apologist—for previous violators of the UCMJ, specifically, one, convicted Lieutenant Calley. These witnesses, presumably, will happily testify as to the veracity of Mr. Meyer's (jr.) claims, and the cogency of

his accusations and argument. Additional law pertaining to this issue, and all the above claims as made by Plaintiff and, himself as Pro Se legal counsel, include the so called "Reconstructions Acts", or the "Military Reconstruction Acts", namely, March 2, 1867, 14 Stat. 428-430, c.153; March 23, 1867, 15 Stat. 2-5, c.6; July 19, 1867, 15 Stat. 14-16, c.30; and March 11, 1868, 15 Stat. 41, c.25. Defendants represented putative "States" (and did so in their action Biden v. Nebraska, 2023) which have, presumably re-entered the "fabric" of the Constitution, and have thus consented to the "dint" and "frame" of lawful adherence to its laws, and Defendants, as such, must adhere to the common notions of freedom of speech, freedom of contract, equal application and protection of the law under the fourteenth amendment, and simple grade school shit like "slavery is bad", and "nobility is outlawed". Plaintiff is undecided, as of present, as to whether he will file a complaint with their respective state bar associations, for the traitorous actions of the Defendants, since removal of their law licenses would be a desirous outcome and a positive good for the nation, as a whole, and a bullwark for the continued existence and health of our cherished and invaluable Democratic-Republic. If their military pensions are to be taken, and right to serve in the Federal Government is to be rescinded, it makes sense to remove their third avenue of monetary remuneration, namely, their exercise of their perverted, traitorous, view of the "rule of law", i.e. removal of their license by their respective "state" bar associations.

33. Plaintiff requests an automatic stay of the consequences of Biden v. Nebraska, 2023, either for Plaintiff only (preferred), or for the broader decision, affecting the country at large, as the judge may deem fit, following FRCP Rule 62.(a), (Stay of Proceedings to Enforce a Judgment; Automatic Stay) given that there is a time sensitive nature, to wit, Plaintiff's desire and need to proceed with his unforgivably delayed education, and with his working, and earning life; to wit, the culture wars of the previous 20 years are unforgivably, and irreparably, delaying his entrance into adulthood and into engaged citizenship and citizenry (see citation and quotation of Meyer v. Nebraska, (1923), as detailed, two claims above this one), not to mention stifling his professional career and intellectual development, in violation of his freedom of speech. Plaintiff will not abide a single additional delay. This aggression will not stand (GHW Bush ; The Big Lebowski, Working Title Films, 1998), man. Such would be, and has in the past been, an Intolerable Act(s). This stay is required to halt any federal student loan procedures which would hinder the Plaintiff's efficacious entry into graduate school, tentatively planned for Spring of 2024 semester.

34. Plaintiff claims the traitorous AGs are a gaggle of liars and fools, and Plaintiff is particularly interested in hearing their response, both in printed response, or counterclaims, and under oath, to this particular, specific allegation. Though acting in their professional capacities, on behalf of their "state" government and in representing their various constituencies, Defendants could not help but reveal their traitorous impulses and inclinations, and couldn't help but inflict their traitorous actions upon their constituents, and by utilizing national judicial musculature to circumvent private contracts between private entities, by extension, upon Plaintiff and his unknown "student loan provider / servicer", and because their legislatures are constitutionally incapable of interfering with said contracts through passage of law, they have, thusly, chosen to inflict their traitorous inclinations upon the people of the entire nation, invalidating the public will, and the executive actions of their properly elected, and empowered, leader, which, in some cases, reveals their true loyalty, to the pretended leader, one DFPTDJT (Disgraced Former President and Traitor Donald J. Trump), leader of the January 6th cabal and insurrection. In support of this claim, Plaintiff offers the following information, as a guide to the accused, as regards their respective varying degrees of culpability. The information falls under three categories (A) initiators of traitorous and illegal suit, (B) initiators not named in this present

suit, by virtue of their retirement or being voted out of office, or into higher office, or other office, (C) newly elected supporters of the continuation of the traitorous and illegal suit, and (D) military traitors, and (E) generally unpatriotic and unethical behavior, and / or conduct not befitting an attorney in good standing with the "State" Bar. Initially, (A) please do note, that some 10 AGs, total, are involved in these bogus, disingenuous, and illegally traitorous argumentations, but only 6 have initiated suit, namely, Doug Petersen, NE; Eric Schmitt, MO; Leslie Rutledge, AR; Derek Larkin Schmidt, KS; Alan McCrory Wilson, SC; with Brenna Bird, IA, "hitching her horse" to that traitorous wagon, later, after her election to the AG post in 2022-2023. It should be noted that these AGs, with the exception of Bird who was not yet elected AG, did not object when former Traitor-in-Chief, D. Trump, "modified" the loan agreements under the HEROES Act of 2003, and thus have surrendered their right to make complaint against the "waiving" of those agreements, since the language (i.e. both "modified" and "waiving", enabling phrases ) of the text exists right within the same active clause. Furthermore, if this June 30ᵗʰ, 2023 Supreme Court case were valid, it would open up borrowers to suit for recovery of sums owed under the illegal Trump usage of the HEROES Act of 2003, and thus, open up a mess and a gaggle of countersuits of borrowers that said sums are beyond recuperation. Retroactive application of the Supreme Courts improper 2023 reading of law is not in the interests of any party, except perhaps the lawyers. Of the 6 AGs in category (A), only two (Bird and Wilson) are still an AG presently, and thus named in this suit. In Category (B) we have initiators of the Biden v Nebraska suit who are not named in this present suit, by virtue of their no longer serving as a state AG. These four traitors, scofflaws and scoundels, are Doug Petersen, NE; Eric Schmitt, MO; Leslie Rutledge, AR; Derek Larkin Schmidt, KS. Petersen has retired from politics and practices law, Schmitt is now US Senator, alongside the notorious Jan. 6ᵗʰ traitor, Josh Hawley, Rutledge is now Lieutenant Governor of her "state", and Schmidt ran for governor and lost. In category (C) we have those named in this present suit who must answer for their own actions, and the actions of their states, in illegally interfering with the private contract of Plaintiff, Randall Meyer, and his unnamed "student loan servicer / provider", and Mr Meyer is particularly interested in hearing, both in written response, and under oath, what business it is of the idiotic and traitorous state of Arkansas, or Nebraska, or Missouri, or etc., if Mr. Meyer pays his loans or not. If Mr Meyer is to be sued by a party, or have his loan agreement's forgiveness invalidated, let the party who was allegedly injured bring suit. Missouri and MOHELA were not entered into contract with Mr. Meyer (to his knowledge; Mr. Meyer will state under oath that he has never even heard of MOHELA until this present month, October/November 2023). Let that be proved, first, before Mr. Meyer's loan forgiveness is removed. In Category (C) , as named in this present suit, are the present 5 AGs who have voluntarily participated and maintained this ongoing charade, namely, Mike Hilger, NE; Andrew Bailey, MO; John Timothy Griffin, AR; Brenna Bird, IA; and Kris William Kobach, KS; all of them AGs who had the opportunity to cease participation with the conspiracy to violate the Plaintiff's civil rights, as instigated and set into motion by others. In category (D) we have both active and former military men who, in addition to the laws of the United States of America, are also bound by ethical precepts, and who owe additional allegiance and fealty, specifically to the commander in chief (or, at the very least, owe allegiance to the signers of their pension checks). These include Alan McCrory Wilson, SC; Andrew Bailey, MO; and John Timothy Griffin, AR. Plaintiff wishes to advise these particular Defendants of the consequences of weakening the minds and fiscal status of America's fighting thinkers, and Plaintiff wishes to remind them specifically of the Uniform Code of Military Justice's attitude towards traitorous pensioners, namely, UCMJ Article 2(a)(4) allows for the court-martial of regular component (Army, Navy, Marine, Air Force, Space Force, and Coast Guard) retirees who are entitled to pay, and Article 2(a)(6) allows for the court-martial of retirees who are part of the Fleet Reserve

or Fleet Marine Corps Reserve. Moreover, despite their retiree status, these two groups are treated like active-duty members in that they are continuously subject to UCMJ jurisdiction. And, finally, presumably, all 10 of the traitorous AGs should be subject to removal of their law licenses and their right to practice, given their egregious and unethical behavior, in front of the entire nation. They, additionally, ought to be ashamed of themselves, and their mothers and fathers and extended family should endure an unending and eternally infamous shame. Category (E) is as follows, and includes all previous and current AGs who have touched this toxic affair ; Mike Hilger, NE; Doug Petersen, NE; Andrew Bailey, MO; Eric Schmitt, MO; John Timothy Griffin, AR; Leslie Rutledge, AR; Kris William Kobach, KS; Derek Larkin Schmidt, KS; Alan McCrory Wilson, SC; and Brenna Bird, IA. All subsequent AGs, after 2023 swearing in, had ample opportunity to vacate, or cease said suit, and did not do so, and judging from subsequent political proclamations, from numerous reporting outlets, these 6 AGs presumably, agree with the traitorous actions, and rhetorical flourishes.

35. Plaintiff notes that some 15% of solders in the modern military are infantry, leaving 5 or 6 support soldiers per front-line soldier, each one of them requiring higher education at reasonable prices, in a highly technical and highly intellectual support role. Plaintiff claims that idiots from the state of Arkansas, in particular, as the "State" that almost killed the Smithsonian institution, will have trouble understanding this simple fact. Plaintiff awaits Defendants' lame excuses, and "poisoned beef" response. Plaintiff further suggests that if Arkansas and the other "Shithole States" insist upon infliction of idiocy upon the national youth, that they offer up their youth, first, in any coming military drafts, in such similar or identical situations as might come to face America in the future, similar to those situations one can witness in the "Insane Nationally Televised Bingo" of 1969, as can be seen on youtube, if one simply searches the phrase "U.S. Vietnam Military Draft televised". A fair lottery would not pick birthdays from a bingo ball, but would pick the sons and daughters of those who unnecessarily, and often illegally, begin the "wars", i.e. "conflicts" (Note, America has not, in proper legal fashion, declared war since WWII), to wit, the Bush children and Trump children, first, and regular Americans afterwards, as needed.

36. Plaintiff claims that the Attorneys General, on behalf of their "States", had every opportunity to deny presidential authority to utilize the HEROES Act 2003 to "waive or modify" during DFPTDJT's (Disgraced Former President and Traitor Donald J. Trump) tenure, and elected not to do so. Seemingly, they did not feel aggrieved by his legitimate utilization of executive authority, and thus, have no basis to claim grievances or damages, real or imagined, past, present, or future, now. Plaintiff offers some modest advice to these career politicians, past and present, and (putative) traitors, alike. "Don't spit in the soup; We've all got to eat it."~ Fred Tuttle, VT Republican candidate for the U.S. Senate, 1998. (See https://www.sanders.senate.gov/in-the-new/bernie-sanders-calls-out-trump-pausing-studet-loan-payments-as-a-reason-why-bidens-debt-relief-plan-is-legal ; January 6 2023, By Ayelet Sheffey; Insider: for an account of DFPTDJT's logical inconsistency).

37. Plaintiff claims, and awaits Defendants' response to the following : Hugo Black's dissent, in Adler v. Board of Education, 342 U.S. 485 (1952): "While I fully agree with the dissent of Mr. Justice Douglas, the importance of this holding prompts me to add these thoughts. This is another of those rapidly multiplying legislative enactments which make it dangerous-this time for school teachers-to think or say anything except what a transient majority happen to approve at the moment. Basically these laws rest on the belief that government should supervise and limit the flow of ideas into the minds of men. The tendency of such governmental policy is to mould people into a common intellectual pattern. Quite a different governmental policy rests on

the belief that government should leave the mind and spirit of man absolutely free. Such a governmental policy encourages varied intellectual outlooks in the belief that the best views will prevail. This policy of freedom is in my judgment embodied in the First Amendment and made applicable to the states by the Fourteenth. Because of this policy public officials cannot be constitutionally vested with powers to select the ideas people can think about, censor the public views they can express, or choose the persons or groups people can associate with. Public officials with such powers are not public servants; they are public masters. I dissent from the Court's judgment sustaining this law which effectively penalizes school teachers for their thoughts and their associates.". ( NOTE: Adler v. Board overturned by Keyshian v. Board of Regents 385 U.S. 589 (1967), a ruling essentially agreeing with Black's dissent, as given, above )

38. Plaintiff, having run for political office, as an Independent, in 2014, arguably seeking the seat of one Matthew Lyons (the only U.S. Congressperson to win a seat while imprisoned), since Vermont has a single at-large district in the U.S. House, is acutely aware of past Federal Government abuses of power, with regards to propaganda, and the often tangled relationship with political speech and freedom of expression. Lyons was imprisoned (convicted, October 10th, 1789 CE) under the Alien and Sedition Acts, widely regarded by historians as politically motivated legislation, and as an abuse of power, which, first was wielded by the Federalists, and later was turned around and wielded by the Democrat-Republicans against the Federalists. The parallels, a century later, to a different jingo-ist political climate, and two hundred years later to the improper application of said 20th century laws to one Australian citizen, Julian Assange, not subject to American laws, and to one Edward Snowden, a whistleblower who alerted the world to the illegal activities of the United States' various intelligence agencies, are too curious and interesting to be ignored. Given Plaintiff's own experience with free speech, and specifically academic freedom of speech, and Plaintiff's lack of success in drawing official attention to the violations against him, Defendants' actions must be viewed in light of the "zeitgeist", and the extent to which they have knowledge, or should have knowledge, of the extent that their actions will, or would, have a "chilling effect" upon Plaintiff's freedom of speech.

39. Plaintiff, and Co-Plaintiff, claim their 14th Amendment rights to equal protection under the Constitution, specifically, to freedom of speech, and freedom from illegal enforced bondage, and cite Dave Davies, and Adam Winkler, in an NPR article, a reputable source of factual reporting, purchased, as it is, in part with taxpayer money ( https://www.npr.org/2018/03/26/596989664/how-american-corporations-had-a-hidden-civil-rights-movement ). Plaintiff, Randall Meyer, is "white", but the corporation he founded in 2004, "Sams Antic Inc." is neither white nor black. In the article given, Professor Winkler states, of the 14th Amendment, that in the 44 years after it was passed and ratified, cases citing the amendment advanced to the supreme court in only 28 cases involving African Americans (i.e. former, recently-emancipated, slaves), while corporations saw 312 cases make it to the highest court in the land. Plaintiff likes those odds, even though he does not like that history. A corporate structure should not be required for a natural person to assert their own, natural born, and fought-for, and bled-for, rights. It should not have required incorporation for Plaintiff to get a job in the sciences, following graduation in 2002 CE. But that is what was necessary, and Plaintiff demands accountability for that illegal set of circumstances and events. Co-Plaintiff asserts, and reasserts, all claims as written, above and below, by Pro Se legal counsel, Mr. Meyer, the Plaintiff, since it may very well be advantageous and proper to advance this case, not under the identity of a natural person, Mr. Meyer, but by a legally "invented" person, i.e. Sams Antics Inc. In particular, if Plaintiff, as a person and citizen cannot sue a "State" in

Federal Court, perhaps a corporation, and particularly a corporation that does not want its sole employee to be muzzled by "State" interference with the right to contract, can sue a "State" in Federal Court.

40. Plaintiff claims that Alan Turing, one of the inventors of modern electronic computers and a presage to the field of "Artificial Intelligence" (though he died before the term was coined, as it was, in 1956, by John McCarthy, at the Dartmouth Summer Research Project) was robbed, and arguably murdered, by the United Kingdom, a fact which is partially assented to, by both Queen, and Prime minister and Parliament. Furthermore, in the earlier mechanical age, the inventor of the marine chronometer, John Harrison was, for a period, robbed of his time (ironically) and enjoyment of life, by dilettantes and various obfuscating, non-specialists who possessed a habitually dilatory and disingenuous manner. The king—that same king who bought, as slave and a mercenary one of Mr. Meyer's ancestors--was quoted as saying "By God, Harrison, I will see you righted.". Plaintiff will not be robbed; not by judicial or legislative fiat. Plaintiff reminds all parties of the immediate precipitating events leading directly to the crafting of the Constitution (see Zinn's description in "People's History of the United States", and Beard's "An Economic Interpretation of the Constitution"), namely, the stoppage of corrupted judicial process by armed revolutionaries, on the Massachusetts courthouse steps, during Shay's rebellion. Plaintiff also reminds all parties of the guarantees sought before the States would sign the Constitution, namely, the Bill of Rights, all ten amendments, including, somewhat ironically, yet understandably, the second amendment. Plaintiff states for the record that he possesses no guns (not even a butter knife!) and desires to possess no guns, but Plaintiff emphatically reiterates, he will not be robbed by legislative or judicial process (Plaintiff arms himself only with lawbooks and keeps one in every room of the house, to assault any hapless, would-be robbers!). Plaintiff, at this moment, finds it instructive, to point out, to all parties, that according to FBI statistics, white collar crime in the USA is under-prosecuted, is 300-400 billion $ per year (See GAO, September, 2017 report "Cost of Crime", for government cost to investigate and prosecute, as well as lost value to society and / or court awards for damages; see also "Trusted Criminals", by David Friedrichs, 2009, regarding uncertainty of measurement), in scale, a ten-fold increase since 1982 (UPI archives, " White Collar Crime Costs $40 Billion Yearly—expert (August Bequai)", by Frank Csongos, Aug. 23 1982), and extends a thousand-fold beyond the 465 million $ (2016) amount of standard, traditional, robbery (see https://ucr.fbi.gov/crime-in-the.u.s/2016/crime-in-the.u.s.-2016/topic-pages/robbery). Since the Enron prosecutions and the Thompson memo (early 2000s), DPAs (Deferred Prosecution Agreements) have increased a great deal, with most experts and observers agreeing that this is bad trend. Plaintiff, having watched this trend, from the sidelines, waiting patiently for some sort of "adult", responsible behavior, to come from his governmental, corporate, and academic institutions, has, nevertheless, been forced to watch the academic, professional, libel and slander continue, unabated, for approximately 20 years. This has been a robbery, of the white collar kind. Plaintiff, Mr. Meyer, claims herein, that his Linguistic law, as a semantic law--not syntactic--supersedes Mr. Turing's (and, later, Mr. Chomsky's, "Universal Grammar", also having a largely syntactic focus) as the fundamental law of A.I. (or "Machine Intelligence" as Turing would have called it; or "Cybernetics" as Norbert Weiner would have titled it), and for that matter, N.I. (Natural Intelligence), and his semantic law "marches to the heartbeat" of Mr. Harrison's chronometer (though, perhaps, more-so, to the beat of Walter Guyton Cady's quartz oscillator, as befits our electronic age). The combinatorial and permutational linguistic law that Mr. Meyer proffers is easily derivable from simple mathematics and from Linguist Typology (See "The Cambridge Encyclopedia of Language", edited by David Crystal, for an excellent precis), and adherence of the putative-communicators, under-test, to one of six possible

-31-

standards ( SOV, SVO, OVS, VSO, OVS or OSV) and is, for the most part, the kind of law that has been "hiding in plain sight", much like Natural Selection which has a storied history of some 200 to 300 to 500 years before Charles Darwin came along and set pen to paper (See Bentley Glass's "Forerunners of Darwin" and Peter Bowler's "Evolution: A History of an Idea" for examples; see especially, the work of Pierre Maupertuis, circa 1745, via Boas' English translation.). Mr. Meyer was born some 45 miles northwest of Dartmouth, and some 24 years after, the term "Artificial Intelligence" was coined there, and furthermore, Mr. Meyer, during the course of his studies leading to a Marine Biology, Bachelor of Science degree (1998-2002), from the University of Rhode Island, had opportunity and occasion to study, at length, the work of one Stephen Jay Gould, "America's Evolutionist Laureate", on the subject of "intelligence", broadly, a perennial "political football" (See Hernstein and Murray's "Bell Curve", 1994, and "Shockley on Eugenics and Race" by Roger Pearson, 1992) in 20th and now, 21st century, American policy debates. From this academic beginning, and through a study of the linguistic works of Noam Chomsky, and the philosophical works of Daniel Dennett (and Paul Thompson's"The Structure of Biological Theories", and Elizabeth Lloyd's similar work "The Structure and Confirmation of Evolutionary Theory"), Mr. Meyer formed his theories regarding the definition of both Artificial and Natural Intelligences, and further, he formed his equation which, in an alternative, verbal explication, can be advanced as one that describes the "semantic boundaries" of a putative intellect, i.e. the subject under study. In short, if a putative natural or artificial intelligence does not possess the word (or concept) "okapi" it can neither say anything meaningful about the okapi, nor understand (without lengthy explication from another intelligence) anything particularly useful or enlightening about an okapi, as that word or concept was used, in real-time, in a sentence. This is what it means to be "semantically circumscribed", or "semantically limited". Furthermore, Mr. Meyer points to the very obvious usage of derivative and integral calculus to characterize the usage of Humean or Lockean "ideas" or "impressions", or Semonian or Dawkinsian "memes". Furthermore, it should be noted, that such open source operating systems, like Linux and Unix, and etc. , have implemented "journaling" systems, and, a quite obvious extension of Meyer's Linguistic Law, would provide some kind of "memetic journal", thus, illustrating, in a very real and measurable way, the application of the memetic integral to generated sentential intelligent statements, as accumulated by a putative intellect, under study, over time. The similar application of Meyer's Law, and its integral, to natural intelligences is also quite obvious and instructive. Plaintiff, Mr. Meyer, in a wistful, reflective, application of historical knowledge, considers his two great grandfathers, one giving his first name Randall, and one lending to him his middle name, Kelly, and both of them working for Gettig Mills, manufacturing, textiles, and wiring (Spring Mills, PA), circa mid 20th century, and, furthermore, in similar nostalgic mood, Mr. Meyer considers this professional, generational, vocational connection to the early years of programmed machine instructions, namely, the work of Jacquard, and his looms, in France, circa 1804 CE (with precursors stretching back to circa 1725 CE). Mr. Meyer offers as evidence of this connection, Ralph Kelly Rossman's USP # 2,810,280, a clipping dial, and vacuum hose, for removal of colored yarn strings from a programmed (argyle sock) knitting machine, a very "Jacquardian" type invention. Randall Meyer, the 1st, worked in the machine shop, and, presumably, manufactured the items designed by Ralph. Given this background information, robbery of Mr. Meyer, Randall Meyer the 2nd, since 2003 CE, when he first derived Meyer's Law, is doubly insulting to history, and to his personal history, and familial history. Furthermore, continuing in a wistful and nostalgic vein, Mr. Meyer considers his present residence on Hawai'i Island, "The Big Island", somewhat serendipitous, as one of the towns on this island is named "Captain Cook", after the famous explorer who also brought a technological wonder to the island, the K1 chronometer, a copy, a recreation, of Harrison's famous timepiece. Mr Meyer brought with him

his Fiber Optic Image Conduits, and his work on "Meyer's Robotic Eye" continues, hindered, incessantly, yet continues unabated, despite these unnecessary travails. Additional familial history includes Regan's Meyer's first employment at Gettig (circa 1962-1966 CE), picking up the "piecework", at the end of the line, the RCA TV wire harnesses and wire assemblies, followed by, circa 1985 CE, employ at the Providence Rhode Island central office telephone building (Washington Street and Green Street, initially, at New England Telephone, but previously "known as The Phone Company", and subsequently as, NYNEX, Bell Atlantic, and then Verizon). This building (there are two phone buildings in downtown Providence), as legend and much historical literature alludes to, was the one where J. J. Carty, famous noted engineer of wiring systems, first experimented (circa early 1880s) with the fully metallic circuit (instead of the standard telegraph's single-wire, earth-return), connecting it to Boston, for improved fidelity of signaling, over long distance calling. One should note a mere passage of 100 years between the events of history and J. J. Carty, and those of the Meyer family, in nearly identical setting and environs. Additionally, circa 1960, one William Hicks invented the Fiber Optic Image Scrambler, under contract at American Optical, for the CIA, but after completing the invention and taking a much needed vacation, Hicks had to inform them that the computers of the day were quickly approaching a state that would disallow the safe use of such devices, since interception of 8 or 10 or 12 scrambled images would be sufficient for unscrambling the images (See Hecht, Jeff, "City of Lights: The Story of Fiber Optics", and Hicks 1962, USP # 3,033,071 "Fiber Optic Field Flattener", and O'Brien, Brian , several JOSA articles circa 1950s, citing Ernst von brucke's 1840s research and analogy to rods and cones of human vision) . The work was not entirely useless, as Hicks received a patent for field curvature correctors, a more suitable use for the FOIC technology, and a use, oddly similar to computing and textile, and wire harness businesses, and coincidence and connection in Plaintiff's life too delicious to pass, in this present discourse, without mentioning it. To rob identity and ability and intellect and work and prestige from so storied a family as Mr. Meyer's is simply unforgivable.

41. Current events. Congresswoman Becca Balint, (D) VT, in the U.S. House (the seat Mr. Meyer, as an Independent, sought in 2014), has introduced a measure to censure the noted insurrectionist Marjorie Taylor Greene, but such was withdrawn, as of this writing, since Ms. Greene's measure to censure Rashida Tlaib was scuttled. Additionally, in the news, as of this writing, early November 2023, is the A.I. Safety Summit, at Bletchley Park, UK, which has resulted in 28 nations signing an agreement titled the Bletchley Declaration. Plaintiff, Mr. Meyer, considers it a positive political step, but not very meaningful for the field of A.I., since it makes no mention of olfactory transducers or gustatory transducers. A.I. simply isn't possible without the invention of those two things: they are debating about a different idea, not A.I. Some researchers call it "soft A.I." or "limited A.I." or "software / algorithmic A.I.". Plaintiff does not consider these systems intelligent enough to be an interesting study, and certainly, no more threat than the humans who design and use them. Additionally, in advance of the summit, President Biden has issued an executive order demanding safety study disclosures from A.I. firms, and since co-Plaintiff in this case, Sam's Antics Inc., is an A.I. firm, established in 2004, and considering the level of ostracism and censorship arrayed against Mr. Meyer and his business creations, this statement, in this lawsuit, will have to suffice as "disclosure". Strong A.I. is no more or less safe than creation of a natural human being, as the goals of Strong AI are production of no more or less than a simulation of, as precise and accurate as a possible, a natural human being.

42. Disgraced Former President and Traitor Donald J. Trump (DFPTDJT, for short) is a slaveowner, This is not in dispute. He is a negligent one, who discards his slaves when he is done with them,

but this is not a disputed fact, and it was paraded in front of the nation, on live television, before he was illegally and unconstitutionally installed as President, in 2016. This is not in dispute. Even DFPTDJT doesn't dispute it. The September 2016 transcript runs thus : CLINTON: "And, indeed, I have met a lot of people who were stiffed by you and your businesses, Donald. I've met dishwashers, painters, architects, glass installers, drapery installers, like my dad was, who you refused to pay when they finished the work that you asked them to do." Trump's flaccid response, an excuse that one would not expect, or accept, from a five-year old child, proceeded thusly; DFPTDJT: "Maybe he didn't do a good job and I was unsatisfied with his work." ( Source : https://www.politico.com/story/2016/09/full-transcript-first-2016-presidential-debate-228761). While slaveowner DFTPDJT is not named in this suit, many of the traitorous AGs who are named in this suit have left their former positions and ascended into higher office, in part, due to their servile, and sometimes eager, acquiescence to his anarchistic tendencies. When one man is allowed to run roughshod over the law, others' take it as their cue to behave badly, in a similar fashion. Plaintiff reiterates his claim that Defendants did seek to re-enslave Mr. Meyer, after George Washington freed his family, the Rossmans (Raussman / Rassman), in May of 1783 CE, and Plaintiff demands that such persons answer, on the stand, in open court, for their criminal actions, and civil violations of his civil rights. Plaintiff further demands that they take the stand and declare their legal opinions as regards the slaveowning, slaveholding, or slavedriving nature of DFPTDJT's uncontested and empirically verifiable, and verified, actions, and, furthermore, that they declare either their support or disapprobation of such activities.

43. Kepler's mother was tried as a witch, in 1615 CE, and in 1620 CE, and Johannes Kepler went through a great deal of trouble to get her freed of the charges. Plaintiff works in the same field as Kepler (human vision, optics and science and philosophy, generally) and his persecution, and familial persecution, is exacted by the same persons and ideological functionaries as were arrayed against Kepler, but perhaps for opposite reasons. Plaintiff is an atheistic scientist, whereas Kepler still maintained a faith. But it was Lutherans, a particularly radical sect of Protestants, at that time, that executed 8 of the 15 women in those 1615-1629 CE trials in Leonberg. When Mr. Meyer was illegally evicted from his mother's former residence in 2019, Mr. Meyer handed the "landlord", a copy of the book "Kepler's Witch", which he promised he would read, but which Plaintiff later found was thrown in the trash. Plaintiff contends that this is because the "landlord" is illiterate, ignorant, and an anarchist, rejecting the law that Plaintiff, Mr. Meyer utilizes, and adhering—despite the landlord's illiterate nature, and inability to understand the words on the legal papers that he brazenly wields--only to that law that he wishes to utilize. The harm done to Mr. Meyer's life, liberty, property, reputation, research, is incalculable, and irreparable. A similar loss to the science of optics occurred in 1859 CE, when the house of one Joseph Max Petzval—inventor of the first lens suitable for portraiture—was broken into, and his papers, representing many years of optics research, were destroyed. His most technical work on optics was never recovered, and would never appear in print, and Petzval, as a result, began to withdraw from society, and ceased his work on optics, favoring acoustics researches in his later years. Petzval is noted for being the first person to design and engineer a usable portrait lens (narrow field of view; short focal length), after the early and intuitive success the Daguerreotypists had with landscape lenses (moderately wide angles, longer focal length). This lawsuit, though lengthy and wordy, and a bit "saucy" at times, is an attempt to publish some of what Mr. Meyer—and humanity—has lost. Defendants' conspiracy to violate Mr. Meyer's rights are an extension of, and in furtherance of, the "ignorant program" of the religiously bigoted members of 17th, 18th, and now 21st century Western Society (See "history" and see the "Bush Administration" and see the "Trump Administration", for proof of anti-scientific persecution and forced religious observance, and the "chilling effect" that such

"leaders" inflict upon the nation, and upon the national "zeitgeist". Before this court dismisses, out of hand, charges of government religious favoritism, do note the percentage of congresspersons and percentage of supreme court justices and presidents who are atheists. It is, effectively, 0%, and not for lack of competent or ambitious atheists.). And so, despite Mr. Meyer's irreparable, incalculable loss, he actually expresses pity for these unfortunate creatures, known herein as "Defendants". And so, Mr Meyer claims, herein, that their crimes are not just against Plaintiff, and civil society, and government, at many levels, but are in fact, crimes against humanity (repeated, as they are, from so many years ago, from a very uncivilized "playbook", that of the religious wars of the latter centuries of the 2nd millennium European cultures), and Mr. Meyer, had he the time and resources, and the wherewithal, would seek an international court within which they might be tried. Plaintiff claims that these pitiable creatures known as "Defendants", in this suit, should count themselves lucky that the Plaintiff is of a forgiving nature, and not prone to vengeance, or vexatious reciprocation.

44. Plaintiff did found and incorporate one Sams Antic Incorporated, in the State of Rhode Island, on July 13th or 14th, 2004, with the express written purpose to study, investigate and create A.I., along the lines of Meyer's (Linguistic) Law, and with the specific, though at the time, unstated, intent of using said corporate entity to forestall the exact activities arrayed against Plaintiff, over these ruinous, intolerable 20 years. Plaintiff considers this document to be the explicit statement, 20 years later, of the quiet, unstated part, back in 2004, when he first filed the articles of incorporation. Plaintiff, Mr Meyer considers this legal filing as efficacious expert publication, since all other avenues have been illegally closed to him. Plaintiff would consider peer review, but is, apparently, peerless. Plaintiff demands that the Defendants respond to this claim, in writing, and perhaps, also, on the stand.

45. Plaintiff, Mr. Meyer, does not wish to be a lawyer, and, due to excessively belligerent and pedantic and ignorant and litigious, criminal behavior of the Defendants, Plaintiff has been forced, three times, or more, to act as lawyer, for no monetary remuneration. This is another kind of slavery, since Plaintiff is emphatically nothing other than an evolution biologist, and only sometimes is a philosophic-musician. Plaintiff is never a lawyer, unless he is under threat or duress to become one. Plaintiff will issue financial bills to six "State" AGs, charging for his legal services, for protecting both Plaintiff and the other U.S. Citizens that these "AGs" have refused to genuinely protect. The six offensive, and offending states, have been sent a legal bill for the two months (September and October 2023) that Plaintiff was forced to act as his own lawyer, Pro Se, when these "patriots" and "public servants" should have been protecting his civil rights (rather than attacking them) *a priori*, as a matter of course, and should not have forced Mr. Meyer to become a lawyer, in order to receive his pay for being an evolution biologist. The bills were calculated as follows, using ziprecruiter.com's value for yearly salary of a Seattle civil rights lawyer. Forty hour work weeks were estimated, but probably an underestimate, and 8 weeks were estimated, but also probably an underestimate. Ziprecruiter.com cites 53.96$ per hour as a fair value, average value, of a civil rights lawyer in Seattle, Washington, and so, some 320 hours times that yeilds a total legal bill of $17,267.20. Divided six ways, for the six ignorant states, and their traitorous, malicious, reckless, and negligent AGs, comes out to a bill of $2,877.86 each. Bills have been printed, stamped, enveloped and delivered to the (a) State Bursar and / or Treasury of each "state", (b) Governor of each "state", (c) Attorney Generals of each "state". Each bill was sent, also, with the notice of suit and / or waiver of notice of suit.

46. Plaintiff enters into the record the following Johnny Cash lyrics : "Well I got a friend named

Whiskey Sam / He was my boonierat buddy for a year in `Nam / He said I think my country got a little off track / It took 'em twenty-five years to welcome me back / But its better than not coming back at all / Many a good man I saw fall / And even now, every time I dream / I hear the men and the monkeys in the jungle scream / Drive on, it don't mean nothin', my children love me, but they don't understand / And I got a woman who knows her man / Drive on, it don't mean nothin' / it don't mean nothin', Drive on / Well I remember one night, Tex and me / Rappelled in on a hot LZ / We had our 16s on rock and roll / And with all of that fire I was scared and cold / I was crazy, and I was wild / And I have seen the tiger smile / I spit in a bamboo vipers face / And I'd be dead, but by God's grace / Drive On … Chorus / It was a slow walk in a sad rain / And nobody tried to be John Wayne / I came home, but Tex did not / And I can't talk about the hit he got / But I got a little limp now when I walk / And I got a little tremelo when I talk / But my letter read, from Whiskey Sam / You're a walkin' talkin' miracle from Vietnam / Drive On … Chorus.". Plaintiff's family knows the sentiments of this song well, and Defendants do not.

47. Plaintiff, Mr. Meyer, apologizes to all parties, for not making a more complete attempt at listing a total of "95 Theses", worthy of logical, empirical and jurisprudential debate.

48. Plaintiff would like to introduce the "parties" that the "system" that the Defendants are abusing, robbed. Ralph Rossman (Great Grandfather, WWII; seated), Regan Meyer (Father, Vietnam Veteran; standing, in white and blue shirt), and Randall Meyer (far right, smirking child): Three Generations of Technologists. Ralph and Helen's daughter (Helen standing), Louise (not pictured), married Regan's father, Nevin Meyer. Nevin's father worked with Ralph at Gettig and his name was Randall Meyer (the 1st). Plaintiff, at this point, while not apologizing for rough language, or seemingly-unfair vocabulary directed at Defendants, would point out, here, that, Plaintiff is a scientist, and if he could have used milder, more polite language in the description of Defendants' actions, and still maintain scientific accuracy and precision, he would have. Looking back, fairly, at history, philosophy, science and family, Plaintiff doubles-down, and reiterates all accusations and legal and logical argumentation, and pejoratives, in the vindication, of himself, his own actions, his own intellectual productions, and his family's honor, duty, diligence, and sacrifice. Plaintiff, at this point, demands apologies from all involved parties. Failing acquisition of this simplest of civilized, societal courtesies, Plaintiff assaults and forever denounces their—Defendants'—family honor.



Meyer and Rossman Family.



FOIC Goldberg Polyhedra G{5,0} : Spherical Focal Surface Array, cross section.



Goldberg Polyhedra G[5,0], 3-D View: Curve # 1, in Graphite, measured below.





Proof of Concept, Goldberg Polyehdra, G[1,0] (?); Glued CMOS imagers on pencils.



Ralph Nader Green Party Rally.
Madison Square Garden, 10/13/2000



U.S House Debate, 2014, Vermont Public Television

Relief:

Plaintiff seeks relief via (I.) the issuance of several writs of mandamus, as outlined above in the claims, as stated. Further, Plaintiff seeks relief in the form of (II.) a stay of judgment, to nullify the negative consequences of the recent Supreme Court decision (Biden v. Nebraska, 2023), in light of Plaintiff's attending and unique circumstances and legal argumentations, and considering the continuing irreparable harm to Plaintiff's finances and reputation. Finally, for (III.) monetary award, Plaintiff seeks (IIIa.) award for damages in the amount of $10,000, in keeping with the limitations imposed by the Little Tucker Act (March 3, 1887, ch. 359, 24 Stat. 505, 28 U.S.C. § 1491, or, rather, more specifically, 28 U.S.C. § 1346 (a)(2)), from the United States Federal Government, to be used, specifically and solely, in setting up a non-profit organization for the funding the scientific, theoretical, empirical, and philosophical work of so-called "dissident intellectuals" within the United States of America. With regard to the violations and damages of the "States", so-called, Plaintiff seeks (IIIb.) the full damages of the previous 20 years of scientific ostracism and censorship, as their brazen maintenance of the myth of these past 20 years (i.e. myth of "lazy", "unworthy", "scofflaw", students, rather than "victimized", "robbed", "enslaved" students, as Plaintiff, above, alleges, claims, and proves) is unabashed, and chilling to the exercise of freedom of speech. While the lost salary is estimable, via US BOL statistics, the value of lost work, and lost quality of life, has no measure. Plaintiff quite arbitrarily chooses a nice round figure of $10 million, U.S., as, perhaps, a suitable deterrent for future zealots, scofflaws, poltroons, and calumniating scoundrels (as Defendants, most assuredly are!), and invites the judge to consider treble damages, if his/her honor should consider the violations egregious enough to merit additional deterrence for future violators. The six "states" should equally bear the burden of whatever amount is awarded, namely, $X / 6 = Y$, wherein X is the total relief awarded, and Y is the relief owed to Plaintiff, per "state".

Certification and Closing :

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

            For Parties Without an Attorney

            I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

            Date of signing: November 17, 2023
            Signature of Plaintiff ___Randall Meyer___
            Printed Name of Plaintiff ___Randall Meyer___

    For Attorneys

            Date of signing: _____, 20__.

            Signature of Attorney _____
            Printed Name of Attorney _____
            Bar Number _____
            Name of Law Firm _____
            Address _____
            Telephone Number _____
            E-mail Address _____